699 So.2d 662 (1997)
Jack R. SLINEY, Appellant,
v.
STATE of Florida, Appellee.
No. 83302.
Supreme Court of Florida.
July 17, 1997.
Rehearing Denied September 18, 1997.
*664 James Marion Moorman, Public Defender and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Candance M. Sabella, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Jack R. Sliney. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. Sliney was convicted of first-degree murder and armed robbery. For the armed robbery conviction, the trial judge imposed an upward departure sentence of life imprisonment. We affirm the convictions and sentences.
The victim in this case, George Blumberg, and his wife, Marilyn Blumberg, owned and operated a pawn shop. On June 18, 1992, Marilyn drove to the pawn shop after unsuccessfully attempting to contact George by phone. When she entered the shop, she noticed that the jewelry cases were empty and askew. She then stepped behind the *665 store counter and saw George lying face down in the bathroom with scissors protruding from his neck. A hammer lay on the floor next to him. Marilyn called 911 and told the operator that she thought someone had held up the shop and killed her husband.
A crime-scene analyst who later arrived at the scene found, in addition to the hammer located next to the victim, parts of a camera lens both behind the toilet and in the bathroom wastepaper basket. The analyst also found traces of blood and hair in the bathroom sink. The only relevant fingerprint found in the shop belonged to codefendant Keith Witteman.
During an autopsy of the victim, the medical examiner found various injuries on the victim's face; three crescent-shaped lacerations on his head; three stab wounds in his neck, one of which still contained a pair of scissors; a number of broken ribs; and a fractured backbone. The medical examiner opined that the facial injuries occurred first and were caused by blunt trauma. When asked whether the camera lens found at the scene could have caused some of the victim's facial injuries, the medical examiner responded affirmatively. The stab wounds, the medical examiner testified, were inflicted subsequent to the facial injuries and were followed by the three blows to the head. The medical examiner confirmed that the three crescent-shaped lacerations found on the victim's head were consistent with the end of the hammer found at the scene. Finally, the medical examiner opined that the broken ribs and backbone were the last injuries the victim sustained and that the cause of these injuries was most likely pressure applied to the victim's back as he lay on the ground.
The day after the murder, Kenneth Dale Dobbins came forward indicating that he might have seen George Blumberg's assailants. Dobbins had been in the pawn shop on June 18, 1992, and prior to his departure, he saw two young men enter the shop. The two men approached George and began discussing a piece of jewelry that they apparently had discussed with him on a prior occasion.
Dobbins saw the face of one of the men as the two walked past him. Based on the description Dobbins gave, investigators drew and circulated a composite of the suspect. One officer thought his stepdaughter's boyfriend, Thaddeus Capeles, might recognize the suspect because Capeles and the suspect appeared to be close in age. The officer showed Capeles the composite as well as a picture of a gun that had been taken from the Blumbergs' pawn shop. Capeles did not immediately recognize the person in the composite but later contacted the officer with what he believed to be pertinent information. Capeles told the officer that when he visited the Club Manta Ray, Jack Sliney, who managed the teen club, asked him whether he was interested in purchasing a gun. He thought the gun Sliney showed him looked somewhat like the one in the picture the officer had shown him.
The officer arranged a meeting between Capeles and Carey Twardzik, an investigator in the Blumberg case. During that meeting, Capeles agreed to assist with the investigation. At Twardzik's direction, Capeles arranged a controlled buy of the gun Sliney had shown him. His conversations with Sliney, both on the phone and at the time he purchased the gun, were recorded and later played to the jury. After discovering that the serial number on the gun matched the number on a firearms register from the Blumbergs' pawn shop, investigators asked Capeles to arrange a second controlled buy of some other guns Sliney mentioned during his most recent conversation with Capeles. Capeles' conversations with Sliney regarding the second sale, like the conversations surrounding the initial sale, were recorded and later played to the jury. As with the first sale, the serial numbers on the guns Capeles obtained matched the numbers on the firearms register obtained from the Blumbergs' shop. At trial, Marilyn Blumberg identified the guns Sliney sold to Capeles and confirmed that they were present in the pawn shop the day prior to the murder.
Shortly after the second gun transaction, several officers arrested Sliney. The arrest occurred after Sliney left the Club Manta Ray, sometime between 1 and 1:45 a.m. At the time of the arrest, codefendant Keith Witteman and a female were also in Sliney's truck. Despite the testimony of several defense *666 witnesses to the contrary, the arresting officers testified that Sliney did not appear to be drunk or to have any difficulty in following the instructions they gave him.
Following the arrest, Sliney was taken to the sheriff's department. Officer Twardzik read Sliney his Miranda[1] rights, and Sliney thereafter indicated that he wanted to talk. He gave both written and taped statements in which he confessed to the murder. In his taped statement which was played to the jury, Sliney told the officers that shortly after he and Keith Witteman entered the shop, they began arguing with George Blumberg about the price of a necklace Sliney wanted to buy. According to Sliney, Witteman pressured him to hit Blumberg. Sliney grabbed Blumberg, and Blumberg fell face down on the bathroom floor. Sliney fell on top of Blumberg. Sliney then turned to Witteman and asked him what to do. Witteman responded, "You have to kill him now," and began taking things from the display cases and placing them in a bag. Thereafter, Sliney recalled hitting Blumberg in the head with a camera lens that Sliney took from the counter and stabbing Blumberg with a pair of scissors that Sliney obtained from a drawer. Sliney was somewhat uncertain of the order in which he inflicted these injuries. Next, he recalled removing a hammer from the same drawer in which the scissors were located and hitting Blumberg on the head with it several times.
Sliney left Blumberg on the floor. He washed his hands in the bathroom sink, and then he and Witteman left the shop. According to Sliney, Witteman, in addition to taking merchandise from the shop, took money from the register and the shop keys from Blumberg's pocket. He used the keys to lock the door as the two exited the shop.
Before returning home,[2] Sliney and Witteman disposed of several incriminating items and transferred the jewelry they obtained from the shop, as well as a .41 caliber revolver,[3] into a gym bag. Sliney put the bag in a trunk in his bedroom. Officers conducting a search of Sliney's home later found the gym bag containing the jewelry and gun.
In addition to recounting the circumstances surrounding the murder, Sliney told the officers that he had been in the pawn shop prior to the murder. He said, however, that he did not decide to kill Blumberg before entering the shop or at the time he and Blumberg were arguing. Rather, he told them that he did not think about killing Blumberg until Witteman said, "[W]e can't just leave now. Somebody will find out or something. We got to kill him."
Prior to trial, Sliney moved to suppress the statements he made to the law enforcement officers. He alleged that the statements were involuntary and thus inadmissible. The trial court denied the motion. At trial, Sliney presented several witnesses to the jury in support of his position that his confession was untrustworthy. Sliney also testified on his own behalf. His testimony was inconsistent with the statements he made to law enforcement officers. He testified that it was actually Witteman who murdered Blumberg. Sliney told the jury that he paid for the necklace he was looking at before he began arguing with Blumberg over the price. During the argument he grabbed Blumberg, and Blumberg fell to the floor. When he saw that Blumberg was bleeding, he left the shop. He lay down in his truck because the sight of the blood made him sick. Several minutes later, Witteman came out to the truck. He removed a pair of weight lifting gloves from Sliney's gym bag and then went back into the shop. When Witteman exited the shop again he had with him a gun and a pillow case full of things. Sliney explained that he did not go to the police when he discovered that Blumberg was dead because Witteman threatened to harm his family.
The jury convicted Sliney of first-degree premeditated murder, first-degree felony murder, and robbery with a deadly weapon. Prior to the penalty phase, Sliney sought to *667 discharge his privately retained counsel. The trial court permitted the discharge and appointed a public defender to represent Sliney in the penalty proceeding. The trial court also granted a continuance to afford the public defender more time to prepare.
In the penalty phase, the jury returned a death recommendation by a vote of seven to five. The trial court imposed an upward departure sentence of life on the robbery count and concurred with the jury's recommendation as to the murder.[4] In aggravation, the trial court found that: (1) the murder was committed while Sliney was engaged in or was an accomplice in the commission of a robbery;[5] and (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest.[6] In mitigation, the trial court found the statutory factors of (1) youthful age,[7] and (2) no significant prior criminal history.[8] However, the court afforded little weight to Sliney's age, which was nineteen at the time of the crime. As to nonstatutory mitigators, the trial court gave some weight to the fact that Sliney was a good prisoner but gave only little weight to the following factors urged by Sliney: (1) his politeness; (2) his status as a good neighbor; (3) his being a caring person; (4) his good school record; and (5) his gainful employment. The court rejected Sliney's request to consider Sliney's confession as a mitigating factor because Sliney had claimed that the confession was involuntary. Finally, the trial court found that Witteman's life sentence for the same offenses was not a mitigating factor in this case because the two defendants were not equally culpable.
On appeal, Sliney raises ten issues: (1) Sliney's confession was involuntary and should have been suppressed; (2) the trial court erred in admitting into evidence portions of the transcript of Marilyn Blumberg's 911 call; (3) the trial court erred in allowing the jury to hear taped conversations between Capeles and Sliney which included expletives and racial epithets; (4) the firearms register from the Blumbergs' pawn shop constituted inadmissible hearsay; (5) the trial court erred in excluding testimony from several inmates to whom Witteman admitted killing Blumberg; (6) the trial court erred in refusing to appoint an investigator to research mitigating evidence and in failing to allow the public defender adequate time to prepare for the penalty proceeding; (7) the trial court erroneously found both aggravating factors; (8) death is disproportionate; (9) the trial court erred in giving an upward departure sentence for the armed robbery count; and (10) the trial court improperly assessed fees and costs against Sliney.

Guilt Phase
Sliney first claims that the trial court should have suppressed the statements he gave to Officers Twardzik and Sisk because the statements were involuntary as a matter of law. Specifically, he alleges that such factors as his age, intoxication, isolation during questioning, previous acquaintance with the officers, and mental state establish that his confession was involuntary. A confession obtained by means of physical or psychological coercion or a violation of a constitutional right will be deemed involuntary and inadmissible. In order for a confession to be admissible, the State must demonstrate by a preponderance of the evidence that the confession was voluntary. Roman v. State, 475 So.2d 1228, 1232 (Fla.1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986); DeConingh v. State, 433 So.2d 501, 503 (Fla.1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). Whether a confession is voluntary depends on the totality of the circumstances surrounding the confession. Traylor v. State, 596 So.2d 957, 964 (Fla.1992); Thompson v. *668 State, 548 So.2d 198, 203-04 (Fla.1989); Roman, 475 So.2d at 1232.
In addition to claiming his confession was involuntary, Sliney alleges that the State failed to establish that he validly waived his rights prior to his confession because the investigating officers did not obtain Sliney's signature on the bottom of the Miranda rights warning form. An invalid waiver, like an involuntary confession, can serve as a basis for suppressing Sliney's statements. See Traylor, 596 So.2d at 966; State v. Graham, 240 So.2d 486, 488 (Fla. 2d DCA 1970), disapproved on other grounds, Johnson v. State, 294 So.2d 69 (Fla.1974). To determine if a waiver is valid a court must make two inquiries. First, the court must determine if the waiver was voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); see also State v. Mallory, 670 So.2d 103, 106 (Fla. 1st DCA 1996). Second, the court must determine whether the waiver was executed with a full awareness of the nature of the rights being abandoned and the consequences of their abandonment. Fare, 442 U.S. at 725, 99 S.Ct. at 2572; Mallory, 670 So.2d at 106. As with determining the voluntariness of a confession, a court must use a totality-of-the-circumstances analysis to determine whether a waiver of Miranda rights meets these criteria and is thus valid. Likewise, the State has the burden of proving the waiver is valid by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168-69, 107 S.Ct. 515, 522-23, 93 L.Ed.2d 473 (1986).
First, we address Sliney's contention that his waiver of rights was invalid. There is no question that Sliney waived his rights in this case. The question we must answer is whether the waiver was knowing, intelligent, and voluntary. We do not find that the failure to sign the Miranda form in full in this case invalidated the waiver. Moreover, we conclude that no other basis exists for finding that the trial court abused its discretion in finding Sliney's waiver valid.
The record reflects that after Sliney's arrest, Officers Twardzik and Sisk accompanied Sliney into an interview room. Twardzik and Sisk testified at the suppression hearing that Twardzik read Sliney his Miranda rights from a form. Twardzik then asked Sliney, in accordance with the form, whether Sliney understood each of his rights and whether, having these rights in mind, he wished to talk to the officers. Sliney responded affirmatively to both questions and thereafter signed his name to the top portion of the form.
After signing the form, Sliney began asking the officers questions. As a result of Sliney's questions, Twardzik got sidetracked and forgot to have Sliney sign the waiver-of-rights provision located at the bottom of the form.[9] Instead, in response to Sliney's questions, Twardzik told Sliney that he had been arrested because the weapons he sold to Capeles were stolen. Sliney responded that he had been forced to buy the weapons and some jewelry from a man in Port Charlotte three weeks earlier.
After briefly exiting the interview room, Twardzik returned and told Sliney that he had trouble believing the story because the guns were taken only ten days earlier. At that point, Sliney said, "I know both of you guys," and said to Officer Sisk, "I know your sons." Sliney's eyes began to well up with tears. He requested a pen and paper and began writing a statement in which he confessed to the murder. Once the written statement was complete and Sliney had regained his composure, Twardzik took a taped statement. In that statement, Sliney orally confessed to the murder. Sliney testified at the suppression hearing that he was intoxicated at the time of his arrest and did not *669 recall being read his rights or making any statement to the police.
We find this case similar to Hogan v. State, 330 So.2d 557 (Fla. 2d DCA 1976), authored by then Judge Grimes. In Hogan, an officer read the defendant his Miranda rights but failed to obtain a written waiver of counsel. Hogan, 330 So.2d at 557. The failure to obtain the written waiver, however, was not fatal to the admissibility of the confession, wherein Hogan stated that he understood those rights and was willing to talk to the officer. Id. at 559. In accord with Hogan, we do not find that the officers' failure to obtain Sliney's signature on the bottom portion of the Miranda form necessarily invalidated his waiver. Rather, we agree with the trial court's conclusion in the instant case.
The trial court, after listening to various witnesses, including Sliney, listening to Sliney's taped statement, and reviewing Sliney's written statement, found that Sliney was not at the time of the arrest impaired by alcohol to the extent that he lacked the ability to exercise his free will. Additionally, the court found that no threats or promises were used to obtain Sliney's confession. Based on these findings, the trial court concluded that Sliney's waiver was voluntarily and knowingly made. We conclude that there is competent, substantial evidence in the record to support the trial court's findings. Thus, as the court did in Hogan, we find that the totality of the circumstances reflect that Sliney's waiver was knowing, intelligent, and voluntary.[10]
We now turn to Sliney's contention that his confession was involuntary. In this case, the factors we considered in determining whether Sliney's waiver was knowing, intelligent, and voluntary, and thus valid, are also relevant to our analysis of his confession. Consequently, we find that Sliney's confession, like his waiver, was voluntary. We note, however, that a separate analysis of Sliney's confession was necessary because a valid waiver, while it may be significant proof that a confession is voluntary, does not always result in a voluntary confession. See Traylor, 596 So.2d at 966. Other circumstances independent of the waiver might exist that make the confession involuntary. However, we find that this is not the case here.
In his second claim, Sliney alleges that the trial court erred in allowing the prosecutor to read to the jury the transcript of Marilyn Blumberg's 911 call because it was inadmissible hearsay; it was irrelevant; and any probative value the transcript may have had was outweighed by the danger of unfair prejudice. Although we agree with Sliney that the trial court's finding as to the hearsay issue was somewhat confusing,[11] we find that the statement was admissible as an excited utterance pursuant to section 90.803(2), Florida Statutes (1993). See Allison v. State, 661 So.2d 889, 894 (Fla. 2d DCA 1995); Ware v. State, 596 So.2d 1200, 1202 (Fla. 3d DCA 1992). Furthermore, we do not find the trial court abused its discretion in finding the statement relevant. In rejecting Sliney's final challenge to the transcript as without merit, we note that in an abundance of caution, the trial court had the prosecutor read the transcript rather than play the tape of the 911 call in order to avoid any unfair prejudice that might have resulted from Marilyn Blumberg's excited voice. Additionally, the trial court, at Sliney's request, removed any paraphrasing from the transcript that described Marilyn's tone.
As his third issue, Sliney contends that the trial court erred in admitting certain portions of the tape-recorded conversations between Sliney and Thaddeus Capeles. At *670 trial, Sliney initially objected to the admission of the tapes on relevancy grounds. Thereafter, Sliney asked that if the recordings were found relevant, certain objectionable portions containing offensive language and racial epithets be omitted. Sliney maintains that these particular portions of the transcript lacked any probative value and served only to portray Sliney in a bad light. We agree with the trial court, which reviewed the tapes before they were admitted to the jury, that the taped statements were relevant and that their probative value was not outweighed by their prejudicial effect.
In his fourth claim, Sliney contends that the firearms register which the State introduced into evidence was inadmissible hearsay. According to Sliney, the register could not be introduced pursuant to the business-records exception to the hearsay rule because Marilyn Blumberg's testimony indicating that the register came from the Blumbergs' shop did not lay a proper foundation for this exception. Assuming that the firearms register was improper hearsay, we find that its introduction was harmless beyond a reasonable doubt in light of the remaining evidence against Sliney and in light of Marilyn Blumberg's testimony at trial that the guns Capeles purchased from Sliney had been in the Blumberg's pawn shop the day prior to the murder.
In his fifth claim, Sliney contends that the trial court erred in precluding the testimony of several witnesses whose testimony was critical to Sliney's defense. Before Sliney presented his case to the jury, he proffered the testimony of Witteman and several inmates who were incarcerated with Witteman. When Witteman was called to the stand, he invoked his privilege against self-incrimination, thereby establishing his unavailability. Two of the inmates then testified that during a particular sequence of events, Witteman told one of them to shut up or "he'd kill him like he did the other old bastard." The trial court found that Witteman's statement as relayed by the two inmates was untrustworthy and thus did not meet the requirements of section 90.804(2)(c), Florida Statutes (1993). Sliney contends that Witteman's statement was trustworthy and that even if the statement did not meet the requirements of section 90.804(2)(c), his constitutional right to present a defense should have taken precedence over the exclusionary rules of evidence. We reject Sliney's contentions.
First, we find that there is competent, substantial evidence in the record to support the trial court's finding that there were insufficient corroborating circumstances to show the trustworthiness of Witteman's statement. Sliney's claim that the State should not have been permitted to argue that Witteman's statement was untrustworthy because it prosecuted Witteman for the same murder is baseless. In Witteman's case, the State did not proceed on a theory that Witteman actually performed the murder.
Likewise, we reject Sliney's contention that the hearsay testimony should be admitted without regard to the Rules of Evidence because it was critical to his defense that someone other than himself committed the murder. Sliney's claim is based upon Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Sliney fails to recognize, however, that in Chambers, the court held that the hearsay statements of a third person who orally confessed to the murder with which the defendant was charged should have been admitted because the statements' reliability was clearly established. See Lightbourne v. State, 644 So.2d 54, 57 (Fla.1994), cert. denied, 514 U.S. 1038, 115 S.Ct. 1406, 131 L.Ed.2d 292 (1995); Czubak v. State, 644 So.2d 93, 95 (Fla. 2d DCA 1994), review denied, 652 So.2d 816 (Fla. 1995). The same cannot be said for the hearsay statement at issue here. Consequently, we reject Sliney's final guilt-phase claim, and we affirm Sliney's convictions as we find that the record contains competent, substantial evidence to support them.

Penalty Phase
Sliney raises several issues concerning his death sentence. In issue six, Sliney claims the trial court erred in its interrelated rulings in which the court denied Sliney's motions for a continuance and for the appointment of an investigator to research *671 mitigating evidence. Regarding the trial court's ruling on a motion for continuance, such a ruling will not be overturned on appeal unless a defendant demonstrates a palpable abuse of discretion. See Fennie v. State, 648 So.2d 95, 97 (Fla.1994); Echols v. State, 484 So.2d 568, 572 (Fla.1985). Similarly, a trial court's ruling on a motion for appointment of experts will be affirmed on appeal in the absence of an abuse of discretion. See Martin v. State, 455 So.2d 370, 371-72 (Fla.1984). We have reviewed the record in this case, which shows that after the jury returned its guilty verdicts, Sliney moved to discharge private counsel. The trial court asked Sliney specific questions to ensure that the decision was knowing, intelligent, and voluntary. The trial court explained the pitfalls of this decision, and Sliney agreed to discharge his private counsel and accept representation by a public defender. Thereafter, the trial court appointed the public defender who had represented Sliney in the early stages of the case to represent him in the penalty phase.[12] Counsel was appointed on October 4, 1993, with the penalty phase postponed until November 4, 1993, over one year from Sliney's indictment on September 3, 1992. Under these circumstances, we find the trial court did not abuse its discretion in denying these motions.
In issue seven, Sliney challenges the trial court's instructions and findings regarding the aggravating circumstances. First, Sliney challenges the aggravator that the murder was committed during a robbery. In a footnote, he also contends that the trial court erred in denying his motion for directed verdict on the robbery charge. With respect to this aggravator, the trial court found:
The Defendant was charged and convicted of committing robbery. The evidence established that the Defendant and Co-Defendant, Keith [Witteman], entered Ross' Pawn Shop, the business establishment of George Blumberg and took gold jewelry and firearms from George Blumberg.
The Defendant's confession clearly established that the Defendant knocked the victim to the floor injuring him. The Defendant further elaborated that while he was attacking the victim, repeatedly stabbing him in the neck with a pair of scissors and ultimately striking the victim in the head with a hammer, inflicting the fatal wounds, Co-Defendant, Keith [Witteman], was cleaning out the victim's display cases of jewelry and firearms.
The Defendant later sold the firearms taken from the victim's pawn shop. Further, the gold jewelry taken at the robbery was recovered from the Defendant's bedroom at his residence.
We agree with the trial court's finding that there was sufficient evidence in the record, including Sliney's own confession, to support the robbery charge to the jury, the guilty verdict on the charge, and the aggravating circumstance that the murder was committed during the course of a robbery. See generally Jones v. State, 652 So.2d 346, 349-50 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 202, 133 L.Ed.2d 136 (1995); Perry v. State, 522 So.2d 817, 820 (Fla.1988) (contemporaneous conviction for armed robbery warranted finding in aggravation that murder was committed during course of robbery).
We next address the challenge to the aggravator that the murder was committed for purpose of avoiding a lawful arrest. We have long held that in order to establish this aggravating factor where the victim is not a law enforcement officer, the State must show that the sole or dominant motive for the murder was the elimination of the witness. Preston v. State, 607 So.2d 404, 409 (Fla.1992). In this case, Sliney admitted to being in the pawn shop between five and fifteen times prior to the murder. Sliney also stated that he had bargained with the victim on several prior occasions. In Sliney's taped confession, which was played to the jury, Sliney stated that after he initially grabbed the victim, Keith told Sliney that Sliney would have to kill the victim because "[s]omebody will find out or something." Thereafter, Sliney hit the victim with a camera lens, stabbed him with a pair of scissors, *672 and hit him in the head with a hammer. We find this evidence sufficient to support this aggravator beyond a reasonable doubt. See Consalvo v. State, 697 So.2d 805 (Fla.1996). We find the record permissibly supports beyond a reasonable doubt the finding of both of these aggravators. See Echols.
We next address Sliney's issue eight: whether the death penalty is proportionate. In reviewing the proportionality of a death sentence, we must consider the totality of the circumstances in a case and compare it with other capital cases. Terry v. State, 668 So.2d 954, 965 (Fla.1996). Although the trial court did not find the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, this was a particularly brutal murder. The victim was beaten with a hammer to the face and was found with a pair of scissors stuck in his neck, with fractured ribs, and with a fractured backbone. The trial court did find two aggravating circumstances. Moreover, the trial court did not find any statutory mental mitigation. Comparing this to other cases in which the death penalty was imposed, we do not find that the mitigating circumstances which were found to exist in this case make the death sentence disproportionate. See Smith v. State, 641 So.2d 1319 (Fla.1994); see generally Geralds v. State, 674 So.2d 96 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Finney v. State, 660 So.2d 674 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996). Furthermore, we agree with the trial court that the codefendant's life sentence does not require a different result because Sliney was more culpable than his codefendant. See Heath v. State, 648 So.2d 660 (Fla.), cert. denied, 515 U.S. 1162, 115 S.Ct. 2618, 132 L.Ed.2d 860 (1995).
In addition to imposing the death penalty, the trial court imposed an upward departure sentence of life for Sliney's armed robbery conviction. Sliney contends that the upward departure was improper because it was based on victim injury which was already scored. We reject Sliney's contention because the trial court's sentencing order clearly indicates that the upward departure was based upon Sliney's first-degree murder conviction. We have held that a first-degree murder conviction may constitute a valid reason for departure. Bedford v. State, 589 So.2d 245, 254 (Fla.1991), cert. denied, 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992). This is true regardless of whether points have been scored for victim injury on the guideline scoresheet. Id.
Having reviewed the entire record and finding no reversible error, we affirm Sliney's convictions and sentences. However, we set aside the order assessing attorney fees and costs and direct the trial court to provide Sliney with the proper notice and an opportunity to be heard concerning any assessment of fees and costs made pursuant to section 27.56, Florida Statutes (1993). See Bull v. State, 548 So.2d 1103 (Fla.1989). To ensure meaningful appellate review, we also ask that the trial court list any other statute upon which it bases an assessment of costs. See State v. Beasley, 580 So.2d 139 (Fla. 1991); Bradshaw v. State, 638 So.2d 1024 (Fla. 1st DCA 1994).
It is so ordered.
SHAW, GRIMES, HARDING and WELLS, JJ., concur.
KOGAN, C.J., concurs in part and dissents in part with an opinion, in which OVERTON and ANSTEAD, JJ., concur.
KOGAN, Chief Justice, concurring in part and dissenting in part.
I concur with the majority in affirming the defendant's convictions for first-degree murder and armed robbery. Further, I agree with the majority's finding that the trial court did not improperly impose an upward departure sentence for Sliney's armed robbery conviction. However, I dissent as to the imposition of the death penalty and would reduce the sentence to life imprisonment based upon proportionality.
Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. Terry v. State, 668 So.2d 954, 965 (Fla.1996); Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995); Porter v. State, 564 So.2d 1060, 1064 (Fla. *673 1990). It requires a discrete analysis of the facts. Terry, 668 So.2d at 965. The Court must consider the circumstances as set forth in the record in relation to other decisions. Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988). However, the Court cannot consider an aggravator that the trial court did not find. That is essentially what the majority has done here by relying on its own factual finding that the murder was particularly brutal. The trial court did not find the murder in this case was especially heinous, atrocious, or cruel, but the majority finds the "brutality" of the murder distinguishes it from robbery-murder cases such as Terry, Sinclair, Thompson v. State, 647 So.2d 824 (Fla.1994), Livingston, and Caruthers v. State, 465 So.2d 496 (Fla.1985), in which this Court found the death sentence was disproportionate.
In Terry the appellant and a codefendant robbed a convenience store/gas station. 668 So.2d at 957. Appellant entered the convenience store and shot the clerk while the codefendant held the clerk's husband at bay in the station's garage. Id. The jury recommended death by a vote of eight to four and the trial judge followed the recommendation. Id. at 958. In aggravation, the trial court found a prior violent felony and that the murder was committed while engaged in the commission of a robbery. Id. The court found no mitigators. Id.
In reversing Terry's sentence, this Court determined that although there was not a great deal of mitigation, the aggravation was not extensive given the totality of the underlying circumstances. Id. at 965. In particular, the Court noted that the prior violent felony aggravator was based on the appellant's conviction for the contemporaneous assault committed simultaneously by the codefendant rather than a crime committed by the appellant himself. Id. at 965-66. The Court then compared the case to Sinclair and Thompson. Id. at 966. While both Sinclair and Thompson involved only one aggravatorthat the murder was committed in the course of a robberythe cases are factually similar to and involve less mitigation than the instant case. Consequently, I find that like Terry, they support a finding that the death sentence is disproportionate in this case.
Livingston also involved the robbery of a convenience store/gas station during which the store clerk was shot. 565 So.2d at 1289. The trial court found three aggravating factors: previous conviction of violent felony, committed during armed robbery, and committed to avoid or prevent arrest. Id. at 1292. In mitigation, the trial court considered the appellant's age and his unfortunate home life and rearing. Id. This Court struck the avoiding arrest aggravator and, although two valid aggravators remained, as they do in the instant case, found that death was disproportionate. Id.
In Caruthers, as in Livingston, the Court struck the avoiding arrest aggravator.[13] 465 So.2d at 499. Unlike Livingston, however, the Court was left with only a single aggravatorcommitted during a robbery. Id. In mitigation, the trial court found no significant history of prior criminal activity, as well as several nonstatutory mitigators. Id. Although the instant case involves slightly more aggravation than Caruthers, I cannot say in reviewing the totality of the circumstances in the two cases that they require different sentences.
Accordingly, I find that the circumstances in this case do not place the murder in the category of the most aggravated and least mitigated and, therefore, do not warrant the death penalty. I would vacate Sliney's death sentence and direct the trial court upon remand to resentence Sliney to life imprisonment with no possibility of parole for twenty-five years, which sentence should run consecutively to his life sentence for armed robbery.
OVERTON and ANSTEAD, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Both Sliney and Witteman lived with Sliney's parents.
[3] This gun was not listed on the firearm register found in the Blumbergs' shop.
[4] The trial court did not issue a sentencing order in this case until it completed Witteman's trial. The jury in that case convicted Witteman of the same three charges: first-degree premeditated murder, first-degree felony murder, and robbery with a deadly weapon. The jury then recommended a life sentence. The trial court concurred and sentenced Witteman to life for first-degree premeditated murder.
[5] § 921.141(5)(d), Fla. Stat. (1993).
[6] § 921.141(5)(e), Fla. Stat. (1993).
[7] § 921.141(6)(g), Fla. Stat. (1993).
[8] § 921.141(6)(a), Fla. Stat. (1993).
[9] Subsequently, during his taped statement, Sliney read the waiver of rights which he failed to sign. As indicated by Sliney's taped confession the waiver reads as follows:

I have read this statement waiver of rights and understand what my rights are. I am willing to make a statement and answer questions. I do not want any attorney at this time. I understand and know what I'm doing. No promises or threats have been made to me. No pressure or coercion of any kind has been used against me.
[10] Although we find that the failure to obtain a complete signed waiver in this case did not make the waiver invalid, we reiterate our statement in Traylor that, where reasonably practical, prudence suggests that a waiver of constitutional rights should be in writing. 596 So.2d at 966. We also note that the officers' failure to obtain Sliney's signature on the bottom of the form remains a factor that we must consider in evaluating the totality of the circumstances surrounding Sliney's confession.
[11] The trial court initially found that the 911 call was an excited utterance but then, in discussing the probative value of the transcript, stated "the tape is not excited utterances because a question and answer session begins towards the later part of the tape in an attempt to gain information."
[12] At the hearing on the motions, it was borne out by the State that this public defender was originally assigned to the case, was familiar with the facts of the case, and was present during the depositions of the witnesses.
[13] We also struck the cold, calculated, and premeditated aggravator.