# Supreme Court of Florida

No. SC2015-0391

**JAMES HERARD,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 3, 2024

PER CURIAM.

After a jury trial, James Herard was found guilty of 18 gang-related felonies, including the first-degree murders of Eric Jean-Pierre and Kiem Huynh. The trial court sentenced Herard to death for the Jean-Pierre murder and to life without the possibility of parole for the Huynh murder. Herard now appeals his convictions and death sentence.[1] For the reasons we explain, we affirm in all respects.

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

# I. BACKGROUND

## Guilt Phase

Herard was the second-in-command of the "BACC Street Crips," a Lauderhill-based branch of the national Crips gang. In the early morning hours of November 14, 2008, Herard and two fellow gang members drove the streets of Lauderhill in search of a victim for their ongoing body-count competition. They randomly came upon Eric Jean-Pierre, who had no gang affiliation and just happened to be walking home from a bus stop. As the gang members' car pulled up alongside Jean-Pierre, Herard's co-passenger Tharod Bell reached out from the vehicle with a 20-gauge shotgun. Herard told Bell to "bust it, bust it, bust it," prompting the latter to shoot Jean-Pierre in the chest at point-blank range. The blast blew away part of Jean-Pierre's heart and killed him almost instantly.

That murder was one of many gang-related crimes that Herard and his associates committed between June and December 2008. Those crimes included Herard's murder of Kiem Huynh, which occurred during the robbery of a Dunkin' Donuts store in Tamarac. There were also robberies and shootings at Dunkin' Donuts stores

in Plantation (where Herard had been an employee), Sunrise, and Delray Beach, along with shootings that targeted rival gang members in Lauderhill. On December 2, 2008, Herard and another gang member assaulted two people and stole their pit bull. Lauderhill detectives who witnessed the incident immediately arrested Herard, ending his crime spree.

An indictment and a May 2014 trial on 19 felony counts ensued. The backbone of the evidence at trial consisted of incriminating statements that Herard made to law enforcement during a series of interrogations in the two days or so after his arrest for stealing the pit bull. About the Jean-Pierre murder, for example, Herard told investigators that Tharod Bell would not have pulled the trigger if Herard himself had not provoked the shooting by repeatedly telling Bell to "bust it." The State also presented evidence linking Herard to the 20-gauge shotgun used in many of the shootings (including the two murders) and to a white Toyota Camry seen in surveillance footage near many of the crimes.

Herard did not testify at trial. Defense counsel sought to counter the State's evidence by arguing that Herard's statements to law enforcement were inconsistent (he initially denied having shot

anyone), unreliable, and involuntary. Counsel emphasized that Herard was only 19 years old at the time of the police questioning. The defense also stressed that police had been unable to recover the shotgun used in the murders and other crimes, and it maintained that there was no physical or scientific evidence implicating Herard.

The jury found Herard guilty on 18 counts and not guilty on a robbery count. The offenses of conviction consisted of: 2 counts of first-degree murder; 1 count of racketeering; 1 count of conspiracy to commit racketeering; 1 count of directing the activities of a criminal gang; 7 counts of robbery (4 with a firearm); 3 counts of attempted first-degree murder with a firearm; 2 counts of attempted second-degree murder with a firearm; and 1 count of aggravated battery.

## Penalty Phase

The same jury returned three weeks later for the penalty phase, at which the State sought imposition of the death penalty for both the Jean-Pierre murder and the Huynh murder.[2] As to the

---

2. Before the start of the penalty phase, the court ordered a psychological evaluation of Herard to determine if he was

Jean-Pierre murder, the State sought to prove three aggravating circumstances: prior violent felony; cold, calculated, and premeditated; and committed by a criminal gang member. § 921.141(5)(b), (i), (n), Fla. Stat. (2014). Herard presented mitigating evidence through the testimony of two expert and five lay witnesses. The experts, Dr. Gilbert Raiford and Dr. Myriam Glemaud, chiefly testified about the negative impact Herard's upbringing had on his social, psychological, and behavioral development. The lay witnesses, Herard's family members, testified as to his intellect, good nature, and respectful attitude. They claimed these attributes would render him a valuable asset in assisting other inmates if given a life sentence.

By a vote of 8 to 4, the jury recommended that Herard be sentenced to death for the murder of Eric Jean-Pierre. A majority of the jury recommended a sentence of life imprisonment for the murder of Kiem Huynh.

---

competent. Dr. Atiya evaluated Herard and found that he was competent to proceed.

After conducting a September 2014 *Spencer*[3] hearing at which Herard himself testified, the trial court on January 23, 2015, issued an order imposing a death sentence for the Jean-Pierre murder. The court found that the State had proven the three proposed aggravating circumstances beyond a reasonable doubt. Indeed, the court found the aggravators "overwhelming."

As to mitigation, the trial court found that Herard had failed to establish any of his five proposed statutory mitigating circumstances: extreme emotional or mental disturbance; minor participant; extreme duress; substantially impaired capacity; and age. § 921.141(6)(b), (d)-(g), Fla. Stat. (2014). But the court found that Herard had established 19 non-statutory mitigating circumstances.[4]

---

3. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

4. The trial court found the following non-statutory mitigating factors were established: (1) Defendant was raised without a father; (2) Defendant was raised in very poor financial circumstances and his mother was a strict disciplinarian who believed in punishments considered child abuse today; (3) Defendant was repeatedly subjected and forced to kneel for an unbearable amount of time and had his fingers burnt; (4) Defendant has always had a very close, loving relationship with his mother; (5) Defendant maintained very good, respectful relationships with his aunts, uncles, and numerous cousins; (6) Defendant has a big heart, many times going

The trial court gave "great weight" to each of the three proven aggravators and "little weight" to each of the established mitigators. And, based on a qualitative assessment, it concluded that the aggravators "far outweigh[ed]" the mitigators. Consistent with the jury's recommendations, the trial court sentenced Herard to death

out of his way to help unfortunate others; (7) Defendant befriended Omar Hunter, who suffered from sickle-cell anemia and gave him transportation for treatments when Mr. Hunter had no one else; (8) Defendant, during his incarceration, had a helpful attitude towards others. Many inmates appeared and testified about the help and guidance he provided and how he encouraged fellow inmates to become productive even though incarcerated; (9) Defendant wrote a novel while awaiting trial; (10) Defendant talked two fellow inmates out of giving up and committing suicide; (11) Defendant might be helpful and productive while incarcerated; (12) Defendant is deeply spiritual; (13) Defendant consistently attended church and participated during his childhood; (14) Defendant helped fellow inmates learn English and Mathematics while incarcerated; (15) Defendant obtained employment to help his mother financially; (16) Defendant never received the help and attention he needed to mature as an adult; (17) Defendant only finished ninth grade; (18) Defendant started drinking at age seven; his father gave him his first drink, and again as a 14 year old he was drinking vodka, rum, tequila, and Hennessy. In middle school he smoked marijuana and when entering high school was smoking marijuana five to six times a day; and (19) Dr. Glemaud's testimony supports the non-statutory mitigator that Defendant's behavior is attributable to his environment, which did not support the chance for growth and development.

for the Jean-Pierre murder and to life without the possibility of parole for the Huynh murder.

This direct appeal followed.

## II.  ANALYSIS

On appeal, Herard argues that the trial court erred by: (1) denying Herard's due process-based motion to dismiss; (2) denying Herard's motions to suppress incriminating statements; (3) admitting physical evidence Herard claims was unrelated to the crimes charged; (4) excluding Herard's expert witness testimony about false confessions; and (5) sentencing Herard in a manner that violated the Sixth and Eighth Amendments.  As we must, we also consider whether there is sufficient evidence to sustain Herard's conviction for the murder of Eric Jean-Pierre.

### Denial of Herard's Motion to Dismiss

Herard's first claim sounds in due process and relates to the trial court's dismissal of the first jury venire.  Jury selection in Herard's case initially began on February 11, 2014.  A few days later, with jury selection still underway, a death warrant was signed in a different case where the defendant was represented by Kevin Kulik, Herard's penalty-phase counsel.  Kulik, who had been

participating in jury selection in Herard's case, unsuccessfully attempted to withdraw as counsel in the death warrant case. The trial court tried and failed to secure replacement penalty-phase counsel for Herard. So, with Kulik temporarily unavailable for Herard's case, the trial court granted the State's request to strike the remaining panel of prospective jurors. The trial court then recessed the case.

When his case started up again a month later, Herard sought dismissal of the pending charges on due process grounds. He argued that he had been "extremely pleased" with the remaining jury pool when the initial venire was dismissed, and he maintained that the State had sought the strike solely to gain a tactical advantage. The trial court denied Herard's motion, and Herard now argues that doing so was reversible error.

To support his argument, Herard relies principally on the Fourth District Court of Appeal's decision in *State v. Goodman*, 696 So. 2d 940 (Fla. 4th DCA 1997). In *Goodman*, after a jury had been selected but before it was sworn, the State "nolle prossed" the case and then refiled the same charges 30 minutes later. *Id.* at 940. The trial court found, and the district court agreed, that the State

had acted solely to avoid trying the case to a jury that included "a member whom it had improperly sought to strike" on racial grounds.  *Id.* at 943.  On those facts, the *Goodman* court affirmed the trial court's ruling that the State had violated the defendant's due process rights.

This case is nothing like *Goodman*.  The record here gives no indication that the State acted in bad faith or for an improper purpose.  On the contrary, faced with the temporary unavailability of Herard's penalty-phase counsel (Kevin Kulik), it was reasonable for the State to ask the trial court to dismiss the remaining jury venire and start over once Kulik became available.  In his briefing here, Herard does not dispute that even his guilt-phase counsel (Mitch Polay) agreed that jury selection should not continue in Kulik's absence.  Herard has not shown a violation of his due process rights.

## Admission of Herard's Statements

Herard next challenges the trial court's denial of his motions to suppress various statements he made to law enforcement from December 2 through 4, 2008.  Those statements were made: (1) in the Lauderhill Police Department interview room on December 2,

- 10 -

2008; (2) in the Lauderhill Police Department booking area on December 2, 2008; (3) in the Broward Sheriff's Office Public Safety Building interview room on December 3, 2008; and (4) in the Broward County Main Jail on December 4, 2008. The trial court denied Herard's motions after holding a pretrial evidentiary hearing.

In assessing Herard's claims of error, we defer to the trial court's findings of fact as long as they are supported by competent, substantial evidence, and we review de novo the trial court's application of law to those facts. *Delhall v. State*, 95 So. 3d 134, 150 (Fla. 2012); *Thomas v. State*, 894 So. 2d 126, 136 (Fla. 2004). Applying these standards here, we conclude that the trial court did not err in denying Herard's motions to suppress.

*1. Lauderhill Police Department interview room.*

Herard's initial custodial interrogation was conducted at the Lauderhill Police Department. The interrogation took place after Herard's arrest for stealing the pit bull. Before questioning began, a detective read Herard his *Miranda*[5] rights from a waiver of rights form. Herard initialed the form to indicate that he understood his

5. *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 11 -

rights.  The detective then read aloud the remaining portion of the form, which affirmed the voluntariness of Herard's statement and his willingness to answer the detectives' questions without an attorney.  When the detective finished reading, Herard said, "I don't agree to that," and added that he wanted an attorney.  The detective replied, "Oh, okay, that's no problem."

Immediately thereafter, as the detective collected her paperwork to leave the room, Herard said: "Hold on, hold on.  If I get an attorney do I gotta wait?"  A brief conversation ensued where the detective explained to Herard that he would not wait in the interview room, but would be booked and remain there until an attorney arrived.  Herard then said, "I don't want an attorney."  The detective responded, "Do you want to talk or not?"  Herard then asked to sign the paperwork.  The detective again asked, "Do you want to talk to us?"  Herard answered "yes" and proceeded to sign the waiver of rights form.  During the ensuing interview, Herard made incriminating statements about the theft of the pit bull.

Herard argues that the trial court erred in denying his motion to suppress any statements he made to the Lauderhill detectives— and that, indeed, *all* the statements he made over two days of

questioning were tainted and inadmissible. According to Herard, once he invoked his right to an attorney, there should have been no further questioning without an attorney present. The trial court rejected that argument after finding that Herard himself reinitiated communication with the police and then validly waived his *Miranda* rights.

Our Court's recent decision in *State v. Penna*, 49 Fla. L. Weekly S119 (May 2, 2024), explained the legal test that governs a claim like Herard's. At the threshold, "[w]hen a suspect unequivocally invokes the *Miranda* right to counsel, the officers must immediately stop questioning the suspect." *Id.* at S120. The parties here have assumed that Herard's invocation of his right to counsel was unequivocal, so we will, too. That takes us to the next steps in the analysis.

There can be no subsequent interrogation of the suspect without counsel present unless two conditions are met: (1) the suspect must reinitiate contact with the police; and (2) the suspect must knowingly and voluntarily waive his earlier-invoked *Miranda* rights. *Id.* "The latter inquiry turns on the totality of the

circumstances." *Id.* at S121. We have no difficulty finding these conditions met here.

When Herard stated that he wanted an attorney, the Lauderhill detectives acknowledged the request and began to leave the room. But Herard immediately reinitiated communication, asking whether he would be booked and if he would have to wait for an attorney. After a detective answered Herard's questions, Herard indicated that he wanted to sign the waiver form. The detective then asked a couple of follow-up questions to clarify Herard's wishes before giving him the form to sign. The entire exchange—from the detective reading the rights disclosure and waiver form, to Herard saying he wanted an attorney, to Herard then changing his mind and signing the form—took less than three minutes. Under these circumstances, the trial court was right to deny Herard's motions to suppress the statements he made to the Lauderhill detectives.

*2. Lauderhill Police Department booking area.*

After the Lauderhill detectives finished questioning Herard, he was taken to the Broward Sheriff's Office. On his way out of the Lauderhill Police Department, Herard looked into the waiting room

where uniformed officers from Sunrise, Lauderhill, and the Broward Sheriff's Office were gathered. Without prompting, Herard stated: "Sunrise, what is Sunrise doing here? Oh ya, Sunrise. Where is Delray?" At trial, the State used these comments to help establish Herard's connection to the Dunkin' Donuts armed robbery that occurred in Delray Beach. Herard claims that his statement should have been suppressed, but we disagree.

*Miranda* warnings are not required unless the defendant is both "in custody *and* under interrogation." *Davis v. State*, 698 So. 2d 1182, 1188 (Fla. 1997). Though Herard was clearly in custody, his statements about Sunrise and Delray were not the product of interrogation. Rather, they were entirely spontaneous and unprompted. We find no error in the trial court's denial of the motions to suppress these statements.

*3. Broward Sheriff's Office Public Safety Building interview room.*

Herard made the next set of statements in response to questioning by officers from various law enforcement agencies while he was in custody at the Broward Sheriff's Office from the early morning through the afternoon of December 3, 2008. It is

undisputed that Herard was again *Mirandized* and that he signed a new waiver of rights form before this interrogation began. Nonetheless, Herard maintains that his subsequent statements were involuntary. Herard points to the length of time he was in custody (starting with his arrest the day before) and says that law enforcement did not give him enough bathroom breaks or other breaks between questioning. He notes that he twice had to urinate in a McDonald's cup (provided earlier by law enforcement as part of a meal) because no one answered when he knocked on the interview room door. Herard vaguely mentions improper "promises of leniency," but because he makes no specific argument on that point, we deem it forfeited.

In its order denying Herard's motion to suppress, the trial court found the following facts:

> Defendant was in custody at the Broward Sheriff's Office for approximately 12 hours. He was fed, was allowed to take at least three naps which totaled at least 3.5 hours, was given at least two bathroom breaks, and other breaks in between questioning. While this Court found it unsettling that Defendant urinated twice in his McDonald's cup, he was in fact afforded bathroom breaks.

- 16 -

The trial court summed up its ruling by explaining that Herard "was not threatened or coerced, nor was he deprived of any of his basic needs including food, rest and an opportunity to use the bathroom."

"Whether a confession is voluntary depends on the totality of the circumstances surrounding the confession." *Sliney v. State*, 699 So. 2d 662, 667 (Fla. 1997). When the voluntariness of a confession is in dispute, it is the State's burden to prove voluntariness by a preponderance of the evidence. *Id.* Proof that a defendant validly waived his *Miranda* rights is a significant but not dispositive factor in determining the voluntariness of a confession. *Id.* at 669.

We find no error in the trial court's ruling. Its factual findings are supported by the record, and its conclusion about the voluntariness of Herard's statements is consistent with precedents of this Court finding confessions voluntary under comparable circumstances. *See, e.g.*, *Perez v. State*, 919 So. 2d 347, 361-62 (Fla. 2005) (voluntary confession stemming from 25-hour interview where the defendant was permitted to take smoking and restroom breaks, provided with food and drink, and slept for about six to eight hours); *Chavez v. State*, 832 So. 2d 730, 749 (Fla. 2002)

(upholding voluntariness of a confession where the defendant was in custody for over 54 hours but provided with food, drink, and cigarettes as requested, given frequent breaks and a six-hour rest period, and repeatedly *Mirandized*).

*4. Broward County Main Jail.*

Finally, Herard contends that the trial court erred by not suppressing statements he made to law enforcement on December 4, 2008, at the Broward County Main Jail. Around 6:00 p.m. on December 4, two Sunrise detectives visited Herard in jail for questioning. At the outset, Herard was *Mirandized*, waived his rights, and signed a written waiver of rights form. The detectives' purpose in interviewing Herard was to investigate a Dunkin' Donuts robbery and a separate attempted murder, both of which had occurred in Sunrise in November 2008, and both of which would eventually be included among the crimes charged in this case. At trial, the detectives testified about Herard's admission that he participated in the Delray Dunkin' Donuts robbery and that he was the shooter in the attempted murder in Sunrise.

Earlier that day, Herard had attended his first appearance hearing for the pit bull theft. There, Herard was aided by the Public

- 18 -

Defender's Office, which had him execute a "Notice of Defendant's Invocation of His/Her Right to Remain Silent and Right to Counsel." Herard maintains that because he invoked his right to counsel at his first appearance for the pit bull robbery, the Sunrise detectives were prohibited from questioning him on the afternoon of December 4 without counsel present. The trial court disagreed, and so do we.

In *Sapp v. State*, 690 So. 2d 581, 584-86 (Fla. 1997), this Court held that under both federal law and article 1, section 9 of the Florida Constitution, a claim of rights form is ineffective to invoke a suspect's *Miranda* right to counsel if signed before custodial interrogation has begun or is imminent. This is because the "*Miranda* right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against— 'the compelling atmosphere inherent in the process of in-custody interrogation'—and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination." *Id.* at 585 (quoting *Alston v. Redman*, 34 F.3d 1237, 1246 (3d Cir. 1994)).

*Sapp* controls here. When Herard signed the form purporting to invoke his *Miranda* rights, an interrogation was neither underway nor imminent. Hours later, when the detectives met with him in the

county jail, Herard was again informed of his *Miranda* rights, and he validly waived them.

To the extent Herard makes an argument based on his Sixth Amendment right to counsel, that argument is also unavailing. Unlike the Fifth Amendment-based *Miranda* right to counsel, the Sixth Amendment right to counsel is offense-specific. *See Owen v. State*, 986 So. 2d 534, 544-45 (Fla. 2008); *Durocher v. State*, 596 So. 2d 997, 999 (Fla. 1992) (attachment of Sixth Amendment right to counsel for charged crime did not preclude police questioning about other crime). Assuming a Sixth Amendment right to counsel attached at Herard's December 4 first appearance, that right pertained only to the charge for the pit bull incident. Herard was still only a suspect in the crimes he was questioned about later that day—the Dunkin' Donuts robberies and the Sunrise attempted murder. Therefore, the detectives' questioning of Herard did not implicate his Sixth Amendment right to counsel, rendering it unnecessary to address the potential relevance of Herard's waiver of his *Miranda* rights to remain silent and to counsel at the outset of the December 4 interview. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (a valid waiver of *Miranda* rights "typically does the

trick" for effecting valid a waiver of the Sixth Amendment right to counsel).

## Admission of Physical Evidence

Herard next argues that the trial court committed reversible error by admitting several pieces of physical evidence seized from the house of Jonathan Jackson, the leader of the BACC Street Crips gang. The contested evidence consists of a composition notebook, a spiral notebook, ledger paper, a computer printout, a banana style magazine clip, a BB gun, and a composite photographic exhibit of the items. The notebooks and paper contained information about gang membership, meetings, and activities. Herard makes two claims. First, he contends the evidence is unduly prejudicial and lacked relevance, at least to the extent the evidence pertained to Jackson's involvement in gangs other than the BACC Street Crips. Second, he alleges that the search and seizure of Jackson's house was unlawful, rendering the seized items inadmissible. Herard presents no argument on the search and seizure claim, so we deem that issue forfeited.

We find no abuse of discretion in the admission of evidence related to Herard's involvement in the BACC Street Crips, an issue

directly relevant to the racketeering and gang-related charges in the indictment. To the extent there could have been error in the admission of evidence about Jackson's leadership of other gangs, any such error was harmless.

## Expert Witness Testimony

Next, Herard claims that the trial court erred by refusing to admit the expert testimony of Mr. Gregroy DeClue, a licensed psychologist. DeClue would have testified about false confessions and related "inherent problems" with the "Reid Technique," a commonly used method of police interrogation "pioneered by John E. Reid and Associates, aimed at extracting confessions and evaluating suspect credibility." *United States v. Jacques*, 744 F.3d 804, 808 n.1 (1st Cir. 2014). In the proffered testimony, DeClue said that the Reid Technique is one that can lead to true confessions and to false confessions, and that it is unknown what percentage of confessions obtained through the Reid Technique are false. He also said that the Reid Technique was used in this case. Finally, he said that safeguards exist to make a false confession less likely; but he could not say whether such safeguards were used in

this case, because he had not seen all the video footage of Herard's police interviews.

The admission of expert testimony is governed by section 90.702, Florida Statutes (2014). Among other requirements, the proposed testimony must be "the product of reliable principles and methods," and it must be the case that "[t]he witness has applied the principles and methods reliably to the facts of the case." § 90.702(2)-(3), Fla. Stat. Here the trial court excluded DeClue's testimony for several reasons, including that DeClue was unprepared to testify reliably to the interrogation techniques— including any safeguards against false confessions—used in this case. For related reasons, the trial court also questioned the relevance of DeClue's testimony.

To resolve this issue, we need not decide whether expert testimony about the phenomenon or prevalence of false confessions could ever be admissible. DeClue was not prepared reliably to address the specifics of Herard's case, including whether law enforcement used adequate safeguards in its questioning. And DeClue's proposed testimony about the purported link between the Reid Technique and false confessions was equivocal and potentially

confusing to the jury. Under these circumstances, we find no abuse of discretion in the trial court's decision to exclude DeClue's testimony.

## Herard's Death Sentence

The trial court sentenced Herard to death on January 23, 2015, the jury having recommended that sentence by a vote of 8 to 4. The court conducted Herard's sentencing proceedings under the statutory scheme that the United States Supreme Court partly invalidated in *Hurst v. Florida*, 577 U.S. 92 (2016). There the Court held that Florida's (since amended) capital sentencing statute violated the Sixth Amendment to the extent Florida law "required the judge alone to find the existence of an aggravating circumstance," a predicate to the defendant's eligibility for a death sentence. *Id.* at 103.

In *State v. Poole*, 297 So. 3d 487 (Fla. 2020), we upheld a death sentence imposed under our state's pre-*Hurst v. Florida* sentencing procedures and following an 11 to 1 jury recommendation in favor of death. *Id.* at 493. We found the Sixth Amendment rule of *Hurst v. Florida* satisfied in *Poole* because that jury had unanimously found the defendant guilty of a

contemporaneous violent felony. *Id.* at 508. Partly receding from our own decision in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), we further held that (1) the weighing of aggravating and mitigating factors is not a factual determination or "element" for purposes of the federal or state jury trial guarantee; and (2) neither the Eighth Amendment nor any provision in our state constitution requires jury sentencing in capital cases, or a unanimous jury recommendation, or indeed any jury recommendation at all. *Poole*, 297 So. 3d at 503-05.

There is no dispute that Herard's death sentence satisfies the constitutional requirements explained in *Poole*. As in *Poole*, the aggravating circumstances in Herard's case include the prior violent felony aggravator, i.e., that "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." § 921.141(5)(b), Fla. Stat. Here, the same jury that found Herard guilty of murdering Eric Jean-Pierre also found him guilty of committing many other violent felonies, including the first-degree murder of Kiem Huynh. The State also introduced evidence of Herard's violent felony convictions in other cases. These contemporaneous and prior violent felony

- 25 -

convictions amply "satisfied the [Sixth Amendment] requirement that a jury unanimously find a statutory aggravating circumstance beyond a reasonable doubt." *Poole*, 297 So. 3d at 508.

Herard now argues that our decision in *Poole* is wrong and that we should recede from it. But Herard has offered no good reason for us to do so, and we decline the invitation. Also, consistent with our Court's precedents, we reject Herard's argument that he was sentenced under a death penalty scheme that did not meaningfully narrow the class of defendants eligible for a death sentence. *See, e.g.*, *Johnson v. State*, 969 So. 2d 938, 961 (Fla. 2007) (pre-2016 death penalty sentencing statute sufficiently narrows class of eligible offenders); *Lightbourne v. State*, 438 So. 2d 380, 385 (Fla. 1983) (statutory listing of aggravators and mitigators is not unconstitutionally vague).

We find no merit in Herard's challenges to his death sentence.

### Sufficiency of the Evidence

Finally, in cases where a death sentence has been imposed, we must independently review the record to determine whether competent, substantial evidence supports the underlying murder conviction. *See* Fla. R. App. P. 9.142(a)(5); *Kirkman v. State*, 233

So. 3d 456, 469 (Fla. 2018). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006) (citing *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

To prove first-degree premeditated murder, the State had to establish: (1) that Eric Jean-Pierre is dead; (2) that the death of Jean-Pierre was premeditated; and (3) that the death of Jean-Pierre resulted from Herard's criminal act. *See Glover v. State*, 226 So. 3d 795, 804 (Fla. 2017). Under the law of principals, it was not necessary for the State to prove that Herard was the actual shooter. *See* § 777.011, Fla. Stat. (2008) (one who "aids, abets, counsels, hires, or otherwise procures [the] offense to be committed . . . is a principal in the first degree and may be charged, convicted, and punished as such"); *see also Staten v. State*, 519 So. 2d 622, 624 (Fla. 1988) ("In order to be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime.").

In Herard's videotaped statement played for the jury, he discussed the murder of Jean-Pierre with Broward Sheriff's Office detectives. Herard told the detectives that, together with Tharod Bell and another gang member, he drove looking for a "body" for Bell because it was his turn to kill someone. Herard explained that they were in a competition to see who could commit the most murders. They picked Jean-Pierre at random, and as they approached him, Herard told Bell to "bust it, bust it, bust it." Herard even told the detectives that "you might as well give me that body because Tharod would not have done that if I didn't provoke it." The jury also heard evidence from which it could have concluded that the shotgun Bell used to kill Jean-Pierre is the same one Herard used in various other shootings and armed robberies.

In sum, a rational jury could have concluded that Tharod Bell shot and killed Eric Jean-Pierre with Herard's intentional and active aid and encouragement, as part of a plan that Bell and Herard shared. Competent, substantial evidence supports Herard's murder conviction.

### III. CONCLUSION

Because Herard has not demonstrated any reversible error, we affirm his convictions and death sentence.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I agree with the majority that under the circumstances of this case, the trial court did not err in denying Herard's motion to suppress the statements he made to law enforcement.

However, in discussing the statements Herard made in the interview room at the Lauderhill Police Department, the majority cites this Court's recent decision in *Penna v. State*, 49 Fla. L. Weekly S119 (Fla. May 2, 2024), which held that when a defendant voluntarily reinitiates contact with law enforcement, "there is no per se requirement that an officer remind or readvise [an accused]

- 29 -

of his *Miranda*[6] rights." I dissented in *Penna,* because I disagree with the majority's conclusion that this Court may not interpret the Fifth Amendment in a way that grants more protections to Florida's citizens. I reaffirm my dissent in *Penna* here.

Additionally, I reaffirm my dissent in *Lawrence v. State,* 308 So. 3d 544 (Fla. 2020), wherein this Court receded from its decades-long practice of conducting proportionality review in cases involving direct appeals of sentences of death.

For these reasons, I can only concur in the result.

An Appeal from the Circuit Court in and for Broward County,
   Paul L. Backman, Judge - Case No. 062009CF004654A8881

Richard L. Rosenbaum of the Law Offices of Richard Rosenbaum, Fort Lauderdale, Florida,

   for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

   for Appellee

---

6. *Miranda v. Arizona,* 384 U.S. 436 (1966).