944 So.2d 270 (2006)
Jack Rilea SLINEY, Appellant,
v.
STATE of Florida, Appellee.
Jack Rilea Sliney, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC05-13, SC05-1462.
Supreme Court of Florida.
November 9, 2006.
*273 Thomas H. Ostrander, Bradenton, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Jack Rilea Sliney, a prisoner under sentence of death, appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's denial of the motion for postconviction relief and deny Sliney's petition for a writ of habeas corpus.

I. FACTS AND PROCEDURAL HISTORY
Sliney was convicted of first-degree murder and armed robbery. The trial court sentenced him to death for the murder conviction and imposed an upward departure sentence of life imprisonment for the robbery conviction. The facts as described by this Court on direct appeal are as follows:
The victim in this case, George Blumberg, and his wife, Marilyn Blumberg, owned and operated a pawn shop. On June 18, 1992, Marilyn drove to the pawn shop after unsuccessfully attempting to contact George by phone. When she entered the shop, she noticed that the jewelry cases were empty and askew. She then stepped behind the store counter and saw George lying face down in the bathroom with scissors protruding from his neck. A hammer lay on the floor next to him. Marilyn called 911 and told the operator that she thought *274 someone had held up the shop and killed her husband.
A crime-scene analyst who later arrived at the scene found, in addition to the hammer located next to the victim, parts of a camera lens both behind the toilet and in the bathroom wastepaper basket. The analyst also found traces of blood and hair in the bathroom sink. The only relevant fingerprint found in the shop belonged to codefendant Keith Witteman.
During an autopsy of the victim, the medical examiner found various injuries on the victim's face; three crescent-shaped lacerations on his head; three stab wounds in his neck, one of which still contained a pair of scissors; a number of broken ribs; and a fractured backbone. The medical examiner opined that the facial injuries occurred first and were caused by blunt trauma. When asked whether the camera lens found at the scene could have caused some of the victim's facial injuries, the medical examiner responded affirmatively. The stab wounds, the medical examiner testified, were inflicted subsequent to the facial injuries and were followed by the three blows to the head. The medical examiner confirmed that the three crescent-shaped lacerations found on the victim's head were consistent with the end of the hammer found at the scene. Finally, the medical examiner opined that the broken ribs and backbone were the last injuries the victim sustained and that the cause of these injuries was most likely pressure applied to the victim's back as he lay on the ground.
The day after the murder, Kenneth Dale Dobbins came forward indicating that he might have seen George Blumberg's assailants. Dobbins had been in the pawn shop on June 18, 1992, and prior to his departure, he saw two young men enter the shop. The two men approached George and began discussing a piece of jewelry that they apparently had discussed with him on a prior occasion.
Dobbins saw the face of one of the men as the two walked past him. Based on the description Dobbins gave, investigators drew and circulated a composite of the suspect. One officer thought his stepdaughter's boyfriend, Thaddeus Capeles, might recognize the suspect because Capeles and the suspect appeared to be close in age. The officer showed Capeles the composite as well as a picture of a gun that had been taken from the Blumbergs' pawn shop. Capeles did not immediately recognize the person in the composite but later contacted the officer with what he believed to be pertinent information. Capeles told the officer that when he visited the Club Manta Ray, Jack Sliney, who managed the teen club, asked him whether he was interested in purchasing a gun. He thought the gun Sliney showed him looked somewhat like the one in the picture the officer had shown him.
The officer arranged a meeting between Capeles and Carey Twardzik, an investigator in the Blumberg case. During that meeting, Capeles agreed to assist with the investigation. At Twardzik's direction, Capeles arranged a controlled buy of the gun Sliney had shown him. His conversations with Sliney, both on the phone and at the time he purchased the gun, were recorded and later played to the jury. After discovering that the serial number on the gun matched the number on a firearms register from the Blumbergs' pawn shop, investigators asked Capeles to arrange a second controlled buy of some other guns Sliney mentioned during his most recent conversation with Capeles. Capeles' *275 conversations with Sliney regarding the second sale, like the conversations surrounding the initial sale, were recorded and later played to the jury. As with the first sale, the serial numbers on the guns Capeles obtained matched the numbers on the firearms register obtained from the Blumbergs' shop. At trial, Marilyn Blumberg identified the guns Sliney sold to Capeles and confirmed that they were present in the pawn shop the day prior to the murder.
Shortly after the second gun transaction, several officers arrested Sliney. The arrest occurred after Sliney left the Club Manta Ray, sometime between 1 and 1:45 a.m. At the time of the arrest, codefendant Keith Witteman and a female were also in Sliney's truck. Despite the testimony of several defense witnesses to the contrary, the arresting officers testified that Sliney did not appear to be drunk or to have any difficulty in following the instructions they gave him.
Following the arrest, Sliney was taken to the sheriff's department. Officer Twardzik read Sliney his Miranda[[1]] rights, and Sliney thereafter indicated that he wanted to talk. He gave both written and taped statements in which he confessed to the murder. In his taped statement which was played to the jury, Sliney told the officers that shortly after he and Keith Witteman entered the shop, they began arguing with George Blumberg about the price of a necklace Sliney wanted to buy. According to Sliney, Witteman pressured him to hit Blumberg. Sliney grabbed Blumberg, and Blumberg fell face down on the bathroom floor. Sliney fell on top of Blumberg. Sliney then turned to Witteman and asked him what to do. Witteman responded, "You have to kill him now," and began taking things from the display cases and placing them in a bag. Thereafter, Sliney recalled hitting Blumberg in the head with a camera lens that Sliney took from the counter and stabbing Blumberg with a pair of scissors that Sliney obtained from a drawer. Sliney was somewhat uncertain of the order in which he inflicted these injuries. Next, he recalled removing a hammer from the same drawer in which the scissors were located and hitting Blumberg on the head with it several times.
Sliney left Blumberg on the floor. He washed his hands in the bathroom sink, and then he and Witteman left the shop. According to Sliney, Witteman, in addition to taking merchandise from the shop, took money from the register and the shop keys from Blumberg's pocket. He used the keys to lock the door as the two exited the shop.
Before returning home, Sliney and Witteman disposed of several incriminating items and transferred the jewelry they obtained from the shop, as well as a .41 caliber revolver, into a gym bag. Sliney put the bag in a trunk in his bedroom. Officers conducting a search of Sliney's home later found the gym bag containing the jewelry and gun.
In addition to recounting the circumstances surrounding the murder, Sliney told the officers that he had been in the pawn shop prior to the murder. He said, however, that he did not decide to kill Blumberg before entering the shop or at the time he and Blumberg were arguing. Rather, he told them that he did not think about killing Blumberg until Witteman said, "We can't just leave now. Somebody will find out or something. We got to kill him."

*276 Prior to trial, Sliney moved to suppress the statements he made to the law enforcement officers. He alleged that the statements were involuntary and thus inadmissible. The trial court denied the motion. At trial, Sliney presented several witnesses to the jury in support of his position that his confession was untrustworthy. Sliney also testified on his own behalf. His testimony was inconsistent with the statements he made to law enforcement officers. He testified that it was actually Witteman who murdered Blumberg. Sliney told the jury that he paid for the necklace he was looking at before he began arguing with Blumberg over the price. During the argument he grabbed Blumberg, and Blumberg fell to the floor. When he saw that Blumberg was bleeding, he left the shop. He lay down in his truck because the sight of the blood made him sick. Several minutes later, Witteman came out to the truck. He removed a pair of weight lifting gloves from Sliney's gym bag and then went back into the shop. When Witteman exited the shop again he had with him a gun and a pillow case full of things. Sliney explained that he did not go to the police when he discovered that Blumberg was dead because Witteman threatened to harm his family.
Sliney v. State, 699 So.2d 662, 664-66 (Fla. 1997) (footnotes omitted).
The jury convicted Sliney of first-degree murder and recommended death by a vote of seven to five. The trial court followed the jury's recommendation, finding two aggravating factors,[2] two statutory mitigating factors,[3] and six nonstatutory mitigating factors.[4]State v. Sliney, No. 92-451CF (Fla. 20th Cir. Ct. order filed Feb. 14, 1994).
Sliney appealed to this Court, raising ten issues.[5] This Court affirmed Sliney's convictions and sentence. Sliney, 699 So.2d at 672. The United States Supreme Court thereafter denied Sliney's petition for writ of certiorari. Sliney v. Florida, 522 U.S. 1129, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998).
*277 On February 16, 1999, Sliney filed a pro se rule 3.850 motion for postconviction relief. An amended motion was filed by counsel on March 29, 1999. Sliney then filed an amended rule 3.850 motion for postconviction relief, raising six claims on June 19, 2001.[6]

II. EVIDENTIARY HEARING
The circuit court conducted an evidentiary hearing on Sliney's postconviction motion on April 29, 2002. At the hearing, Sliney called his mother, Nancy Sliney, and his brother, Tim Sliney, to testify. The Slineys testified concerning the defendant's alcohol and steroid use prior to the murder and to the inadequacies they perceived in trial counsel's preparation for both the guilt and penalty phases. Sliney also testified at the evidentiary hearing, maintaining that while he hit the victim, who was unconscious when he left the store, he never put scissors in the victim's neck or hit the victim with a hammer. He also testified that his trial counsel failed to adequately investigate potential mitigating circumstances, including his alcohol and steroid use prior to the crime.
The State then called Kevin Shirley, Sliney's guilt-phase counsel,[7] and Mark Cooper, Sliney's penalty-phase counsel,[8] at the evidentiary hearing. Shirley and Cooper both testified to having received inconsistent statements from Sliney concerning his steroid and alcohol use. Both counsel testified that while they reviewed expert opinions concerning Sliney in developing the respective defenses and mitigation strategies, neither wanted to use such testimony because it ultimately would have been damaging to Sliney's case and inconsistent with the claims Sliney made in his testimony at trial. The State also called Dr. Robert Silver, a clinical psychologist who had examined Sliney in preparation for the penalty phase.
On June 19, 2003, Sliney filed a motion to amend his postconviction motion. He sought to add a claim that his guilt-phase counsel was ineffective because counsel failed to disclose an actual conflict of interest. The defense alleged that Shirley had previously represented one of the interrogating officers in this case, Detective Lloyd Sisk, in civil, criminal, and divorce trials. On August 20, 2003, the postconviction court granted Sliney's motion to amend. A supplemental evidentiary hearing was held on this issue on December 2, 2003, at which the only testimony presented was that of Sliney.
The postconviction court subsequently denied all of Sliney's rule 3.850 motion claims. State v. Sliney, No. 92-451 (Fla. 20th Cir. Ct. order filed Dec. 14, 2004) (Postconviction Order). Sliney appeals that denial, raising two issues. Sliney also petitions this Court for a writ of habeas corpus, raising three issues.

*278 III. ANALYSIS OF 3.850 CLAIMS
Sliney alleges that he received ineffective assistance of counsel at trial because (A) his guilt phase counsel operated under a conflict of interest that adversely affected his performance; and (B) both his guilt and penalty-phase counsel failed to thoroughly investigate and present mitigation evidence. To establish a claim of ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. The Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. Second, the defendant must show that counsel's deficiency prejudiced the defendant, which occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. Under Strickland, whether counsel was ineffective and whether there was prejudice are mixed questions of law and fact. The legal issues are subject to a de novo standard of review, and the trial court's determination of facts are given deference as long as they are supported by competent, substantial evidence. Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).

A. Conflict of Interest
Sliney first alleges that his trial attorney at the guilt phase, Kevin Shirley, was ineffective because Shirley was operating under a conflict of interest due to his previous representation of a prosecution witness, Charlotte County Detective Lloyd Sisk. Detective Sisk was one of two officers present at the interrogation and subsequent confession of Sliney. Detective Sisk testified at the suppression hearing and at trial that Sliney did not appear to be intoxicated at the time of his arrest. In asserting a claim of conflict of interest, Sliney attached to his amended motion for postconviction relief several documents to demonstrate that Shirley had represented Detective Sisk in civil litigation and in his divorce.
At the supplemental hearing on December 2, 2003, the only testimony presented was that of Sliney, who testified that he did not know about Shirley's previous representation of Detective Sisk. Sliney testified that Shirley never informed him that he had represented Detective Sisk. Sliney asserted that he told Shirley that he was intoxicated during the confession and that he attempted to get Shirley to address several inconsistencies in Detective Sisk's testimony but that Shirley failed to do so. Neither Sliney nor the State called Shirley or Detective Sisk to testify at the hearing.[9]
The postconviction court denied this claim, finding that Sliney had failed to prove that any actual conflict existed. The court noted that it had reviewed Shirley's performance at trial in relation to Detective Sisk's testimony and concluded that there was no evidence to support that any conflict adversely affected his representation *279 of Sliney. The postconviction court finally noted that Sliney had failed to present any expert testimony on the issue or any testimony by Shirley, "although he had every opportunity to do so." Postconviction Order at 26.
We have stated the following in considering an ineffective assistance claim based on a purported conflict of interest:
Initially, we acknowledge that the right to effective assistance of counsel encompasses the right to representation free from actual conflict. See Strickland, 466 U.S. at 688, 104 S.Ct. 2052; Cuyler v. Sullivan, 446 U.S. 335, 349, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). However, in order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708; see also Quince v. State, 732 So.2d 1059, 1065 (Fla.1999). A lawyer suffers from an actual conflict of interest when he or she "actively represents conflicting interests." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. See Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350[, 100 S.Ct. 1708]. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. If a defendant successfully demonstrates the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 350, 100 S.Ct. 1708.
The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. See Cuyler, 446 U.S. at 342, 100 S.Ct. 1708; Quince, 732 So.2d at 1064. Once a defendant satisfies both prongs of the Cuyler test, prejudice is presumed and the defendant is entitled to relief. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 349-50[, 100 S.Ct. 1708].
Hunter v. State, 817 So.2d 786, 791-92 (Fla.2002). Thus, to obtain relief on this claim, Sliney must not only show that Shirley represented Detective Sisk but also that this representation adversely affected Shirley's performance on behalf of Sliney.
We affirm the postconviction court's denial of this issue. The record does indicate that prior to representing Sliney, Shirley represented Detective Sisk in a civil lawsuit and a marriage dissolution proceeding. These representations occurred in 1988 and 1990, respectively, and concluded before Shirley undertook his representation of Sliney. A defense attorney's prior representation of a state witness could establish a basis for conflict because the state witness will be testifying against the attorney's current client. Guzman v. State, 644 So.2d 996, 999 (Fla. 1994); see also Lightbourne v. Dugger, 829 F.2d 1012, 1023 (11th Cir.1987) ("An attorney who cross-examines a former client inherently encounters divided loyalties."). Thus, a potential conflict was demonstrated at the hearing below because Shirley represented both Sliney and Detective Sisk, and Detective Sisk testified on behalf of the State at Sliney's trial.
However, for postconviction relief, the record must demonstrate that this prior representation adversely affected Shirley's *280 performance at trial. In Suggs v. State, 923 So.2d 419 (Fla.2005), the defendant alleged ineffective assistance of counsel because his attorney had simultaneously represented one of the jailhouse informants, Wallace Byars, in his case. We denied this claim and held:
Although it is plain that Suggs and Byars had interests adverse to each other, Suggs' postconviction motion failed to allege that his attorney took any action furthering the interests of Byars that prejudiced Suggs. . . . Petitioner fails to allege a connection between the conflict of interest and a specific deficiency that prejudiced him.
Id. at 438-39. In another case, we held that an attorney's motion for withdrawal was properly denied by the trial court because the witness and the defendant "were not codefendants, and their interests were neither hostile nor adverse to one another." Bouie v. State, 559 So.2d 1113, 1115 (Fla.1990).
Sliney has failed to show how Shirley's prior representation of Detective Sisk adversely affected his representation of Sliney. Detective Sisk was called by the State during the trial proceedings to testify twice, once at Sliney's motion to suppress hearing on August 17, 1993, and once in rebuttal on September 30, 1993. Detective Sisk was only called in rebuttal at trial to counter Sliney's testimony and the testimony of defense witnesses that Sliney was intoxicated on the day that he was arrested. Having reviewed Shirley's cross-examinations of Detective Sisk, we find that there is no evidence that Shirley's representation of Sliney was affected by any potential conflict. Sliney testified at the evidentiary hearing that he passed several notes to Shirley about inconsistencies in Detective Sisk's rebuttal testimony that Shirley refused to bring out in the cross-examination of Sisk, including the subject of Sliney's intoxication during his interrogation. The circuit court judge, in his order denying the postconviction motion, sets forth Sliney's testimony as to the issues Sliney wanted brought out and that Sliney claims were missing in Detective Sisk's testimony. But Sliney did not testify as to the substance of any matters that he contended should have been brought out in cross-examination at the supplemental evidentiary hearing that were not. To the contrary, Sliney acknowledged that all of the information Sliney wanted brought out had been addressed at trial, including the allegations that he was intoxicated at the time of his confession. Sliney did not call Shirley or Detective Sisk at the hearing. Sliney's testimony is the only evidence in respect to what Shirley should have done in this cross-examination that was not done. We find no error in the trial court's denial of relief on this basis.
Alternatively, Sliney argues that this conflict adversely affected him because Shirley probably knew some information about Detective Sisk that could have been used to impeach him but that Shirley could not use the information because it was privileged information. Critically, Sliney has failed to present any evidence that Shirley knew anything that he could have used to impeach Detective Sisk. Although Sliney argues that as Detective Sisk's counsel Shirley must have learned something that could have been used against Detective Sisk, this argument is merely speculative. See Smith v. White, 815 F.2d 1401, 1406 (11th Cir.1987) (denying conflict claim because defendant "completely failed to present any evidence at the evidentiary hearing showing that [his attorney] in fact learned any relevant confidential information during his prior representation"); see also Martin v. State, 761 So.2d 475, 476 (Fla. 4th DCA 2000) (denial of motion to withdraw affirmed because there was "no information in th[e] record showing the *281 substance of the [conflict] representation or when it terminated."). While Sliney argues that Shirley would have refused to divulge that he had any impeaching information had he testified at the supplemental hearing, it was incumbent on Sliney to demonstrate that an actual conflict occurred. Sliney failed to establish a basis for relief in this postconviction claim.
Sliney also argues that Shirley was ineffective because he simultaneously represented Detective Sisk's son in a divorce proceeding at the time of Sliney's trial. However, the only evidence that Sliney presented on this issue was a divorce proceeding in the name of Jeffery Sean Sisk, dated February 9, 1993. Sliney presented no evidence that this person was related to Detective Sisk. More importantly, Sliney presents no evidence his interests and those of Jeffrey Sisk would have conflicted in such a way that Shirley's representation of Sliney was adversely affected.
Thus, we affirm the trial court's determination on this issue.

B. Mitigation Evidence
In this claim, Sliney asserts that his counsel was ineffective for failing to adequately investigate and present evidence that would have mitigated his offenses such that the jury could have reasonably returned a recommendation of a life sentence. At the penalty phase on November 4, 1993, the State presented no evidence, instead resting on the testimony presented at trial. The defense called Jessie H. Burgess, a neighbor of Sliney's, who testified that Sliney was polite, well-mannered, and courteous. Greg Krupa, Sliney's high school track coach, testified that Sliney was a hard worker and never had any discipline problems. William Strickland, Sliney's high school principal, testified that Sliney was involved in many activities, was well-liked, and that Sliney received the Principal's Award in his senior year of high school. The defendant's brother, Timothy Shane Sliney, testified that he had a very good relationship with his brother, stated that Sliney did well in school, and gave anecdotal evidence to show that Sliney went out of his way to assist others, even strangers. Sliney's stepfather, Timothy James Sliney, testified that the family was very close, that the family always did things together, and that Sliney had a bright future before the murder. Sliney's mother, Nancy Sliney, testified that he had a normal childhood and was a good son, and she also provided anecdotal evidence that he helped others. Finally, the defense called Michael Farmer, a corporal at the Charlotte County Sheriff's Department in the Corrections Division, who testified that Sliney had never received any reprimands and that he was a good prisoner.
In the instant claim, Sliney argues that his counsel, at both the guilt and penalty phases of the trial, were ineffective for their failure to investigate and present evidence of mitigation on several issues. The postconviction court denied this claim, holding that Sliney had failed to demonstrate either that counsel was deficient or how counsel's failure to investigate prejudiced the defense. The court noted that "counsel were hamstrung by the facts of the case and the actions of the Defendant himself" and that no additional expert testimony was presented to demonstrate that trial counsel had failed to investigate or develop any particular evidence at the penalty phase. Postconviction Order at 23.
In the context of counsel's failure to investigate and present mitigating evidence, we have held that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated." State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002). However, along with examining what evidence was not investigated *282 and presented, we also look at counsel's reasons for not doing so. Asay v. State, 769 So.2d 974, 985 (Fla.2000). It is incumbent on the defendant to demonstrate that his counsel's failure to investigate and present particular evidence "deprived the defendant of a reliable penalty phase proceeding." Id. (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). The Supreme Court has held:
[O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgment" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."
Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citations omitted) (quoting Strickland, 466 U.S. at 688-89, 691, 104 S.Ct. 2052).
Sliney first asserts that his counsel was ineffective for failing to present any expert testimony at the penalty phase. At the postconviction hearing, Cooper, Sliney's penalty-phase counsel, testified that he did consult several experts. Sliney was evaluated by Dr. Michael Spellman prior to the guilt phase and by Dr. Robert Silver prior to the penalty phase, although neither expert was called to testify at trial. The reports from both Drs. Silver and Spellman were filed with the postconviction court.
Dr. Spellman's report is dated October 14, 1992. Sliney told Dr. Spellman that he and Witteman were hung over when they entered the pawn shop on the day of the murder and that he had injected "between four and six cc's" of testosterone the day before the murder. Sliney told Dr. Spellman that his memory of the crime was very limited. While he reported using steroids, cocaine, marijuana, and Quaaludes, he told Dr. Spellman that he did not use those substances at the time of the murder. He did tell Dr. Spellman that he had ingested a great deal of alcohol within twenty-four hours of the murder. Sliney told Dr. Spellman that he was the only one with an alcohol problem in his family, although Dr. Spellman suspected his brother might have problems as well. Sliney reported a healthy medical and strong educational background. Dr. Spellman concluded his report with a recommendation that the defense consult more experts about possible psychoses, Sliney's steroid use, and other capital defense issues.
In Dr. Silver's November 16, 1993, report, he noted that he examined Sliney on October 14, 1993. Dr. Silver noted that he had read the report of Dr. Spellman. After listing what Sliney had told Dr. Spellman as well as himself, Dr. Silver stated that "Mr. Sliney adjusts the information he provides to suit his purposes. Thus, one cannot know when or whether he is telling the truth." According to Dr. Silver, Sliney changed his story concerning his drug and alcohol use:
What I did note during the interview was that his story had changed between the time he had talked with Dr. Spellman and the present interview. Whereas before he said he had been doing steroids since age 18, this time he said he had planned to do steroids but had never actually taken them before. Nonetheless, he said he did have steroids in his possession. When asked why he told Dr. Spellman he used steroids, he said he had heard that things might *283 go easier on him if he had a steroid problem. This time around, he minimized any prior history of drug use. While he admitted he might have been "pissed off and hung over" when he entered the murder victim's store, he said, "I wasn't drunk when I went into that store."
In addition, Dr. Silver thought that Sliney had "made a life out of creating the necessary appearances that would enable others to believe in him." He noted that "at his core" the defendant was "basically hedonistic, exploitive, manipulative, and expedient," as well as amoral. Dr. Silver concluded that Sliney's actions were due to a character weakness and that he did not participate in the crime because of duress or because of any poor treatment in childhood.
Dr. Silver also testified at the evidentiary hearing. He testified, consistent with his report, that Sliney told him that he had previously used steroids but that he did not use steroids on the day of the murder, although he had consumed alcohol the night before. Dr. Silver noted that Sliney was able to recall "in great detail" the events of the murder. Dr. Silver stated at the hearing his opinion that Sliney only reveals information when it suits his purposes.
We affirm the postconviction court's denial of Sliney's claim that counsel was ineffective for failing to present expert testimony in mitigation. We note that we recently considered a set of claims very similar to those presented here. In Jones v. State, 928 So.2d 1178 (Fla.2006), the defendant asserted that penalty-phase counsel was ineffective for failing to present the testimony of a mental health expert who had evaluated the defendant. We held that the failure to present this expert's testimony was not ineffective because his testimony would have been inconsistent with the other mitigation evidence, it would have opened the door to other damaging evidence, and trial counsel's strategy of humanizing the defendant, a strategy with which this expert's testimony would have starkly contrasted, was valid. Id. at 1184. Thus, counsel's strategic decision not to call the expert and instead rely for mitigation on lay testimony about the defendant was neither deficient nor prejudicial because we found that the expert's testimony could have actually damaged the defendant's chances for a life sentence. Id. at 1186. For the same reasons, we affirm the circuit court's decision to deny the instant claim.
The record in this case shows that the experts drew conclusions that would have been unfavorable for Sliney's presentation of mitigation. Sliney did not demonstrate what mental mitigation his defense counsel could have put forth had Dr. Spellman, Dr. Silver, or even another expert testified. There was no evidence that Sliney had any specific problems that would have mitigated against his sentence. He points to Dr. Spellman's report that Sliney might be suffering from psychoses and that he had blacked out at the time of the crime, but Sliney subsequently told Dr. Silver that he had lied to Dr. Spellman. To have presented Dr. Spellman's report at the penalty phase, after Sliney fully described his recollection of the events during the guilt phase, would have caused harm that would have outweighed any benefits of such evidence.
The only evidence that Sliney can point to as mitigating from Dr. Silver's report were the conclusions that Sliney is immature and that he would have done well in a jail setting. We do not find that defense counsel was deficient for electing not to present this evidence. The remainder of Dr. Silver's report was negative, and we agree that it was an acceptable strategy *284 for defense counsel to elect not to present only part of the report and risk the admission of Dr. Silver's full opinion on cross-examination. Gaskin v. State, 822 So.2d 1243, 1249 (Fla.2002) ("Due to the fact that most of the witnesses who testified at the evidentiary hearing admitted on cross-examination that they were aware of other, very negative information about Gaskin, we agree with the trial court that Gaskin has not demonstrated that he was deprived of a reliable penalty phase proceeding."). For these reasons, we find that defense counsel was not deficient for failing to present expert testimony in mitigation.
Sliney also argues that his counsel was ineffective for failing to investigate and present evidence that Sliney abused steroids and alcohol. At the hearing, Sliney presented testimony from his mother and brother that Sliney had consumed alcohol, at times quite heavily, before the commission of the crime. His brother also testified that he suspected at one point in time that Sliney was using steroids. Sliney testified that he had been using steroids for four years before the murder and that he had used steroids the night before the murder. He also testified that this use made him more short-tempered and aggressive. He stated that he did not tell Dr. Silver about his steroid use because he "wasn't very trusting at that time." He also testified that he repeatedly told his attorneys about his steroid use. Both Shirley and Cooper testified at the postconviction hearing that Sliney had told them that he had only used steroids once or twice and that he never informed them that he had taken steroids or alcohol on the day of the crime.
We agree with the trial court's finding that counsel was not deficient for failing to investigate or present this potential mitigation evidence. Sliney repeatedly represented to his counsel and Dr. Silver that he did not abuse steroids and that, at most, he had tried them once or twice. Even though steroids were reportedly found in his possession when his residence was searched, he insisted that he kept steroids in his possession only because he sold them. Sliney did tell Dr. Spellman that he used steroids, but he then told Dr. Silver that he had lied to Dr. Spellman because he had heard that drug use would help his defense. Counsel had no reason to investigate whether Sliney used steroids or whether any drug or alcohol abuse was relevant to the murder because Sliney never indicated that steroids or alcohol were in any way involved in his actions on the day of the murder.
In addition, Cooper repeatedly testified at the hearing that his approach at the penalty phase was to portray Sliney as a "good, clean-cut kid." Evidence of steroid and alcohol abuse would have directly conflicted with this valid and effective mitigation strategy.
Moreover, Sliney failed to demonstrate at the postconviction hearing that either steroid or alcohol use actually played a role in his actions. No evidence was presented at the postconviction hearing that Sliney was addicted to steroids or alcohol, or that the murder was a result of or correlated with his consumption of these substances. Sliney's family offered only several anecdotes of times when Sliney consumed alcohol. Importantly, even at the postconviction hearing, Sliney never testified that he was under the influence of steroids or alcohol at the time of the crime. There was no testimony that his behavior had significantly changed or that Sliney was unable to function during the times when his family saw him drunk. At most, Sliney and his brother described his behavior as more aggressive around this time.
*285 Finally, Sliney asserts that counsel was ineffective for failing to present mitigating evidence of his family's alcohol abuse. Sliney's mother testified that she and Sliney's stepfather frequently consumed alcohol. Sliney's brother testified that he was a recovering alcoholic and that he had criminal issues because of his alcohol use.
We find no error in the trial court's determination that counsel's failure to investigate and present this information was not deficient. The family portrayed themselves at all times to trial counsel as loving and supportive. There was no presentation, even at the postconviction hearing, that the family was anything but loving and supportive despite their alcohol use. At no point has Sliney shown that his family's alcohol consumption negatively affected him.
We do note that Sliney's sentencing recommendation was by a seven-to-five vote. We recognize that failure to investigate and present available mitigation can be prejudicial, especially with such a close jury recommendation vote. Phillips v. State, 608 So.2d 778, 783 (Fla.1992). However, each of the cases which Sliney cites in support of his arguments here involved more material and specific missing mitigation. See Orme v. State, 896 So.2d 725, 733 (Fla.2005) (counsel failed to discover defendant's bipolar disorder); State v. Lewis, 838 So.2d 1102, 1110-11 (Fla.2002) (defendant had significant history of parental abuse, was a substance abuser, and had sustained physical injuries which caused psychological problems); Ragsdale v. State, 798 So.2d 713, 717 (Fla.2001) (defendant had significant history of drug and alcohol abuse as well as possible brain damage); Rose v. State, 675 So.2d 567, 571 (Fla.1996) (defendant suffered severe emotional abuse as a child, was a chronic alcoholic, and was characterized by a physician as a schizoid); Hildwin v. Dugger, 654 So.2d 107, 110 (Fla.1995) (defendant was under extreme mental and emotional disturbance at time of crime); Phillips, 608 So.2d at 782 (postconviction record revealed such a large amount of mitigation evidence, state conceded that counsel was deficient).
The evidence in the instant case more closely resembles the situation in Rutherford v. State, 727 So.2d 216, 223 (Fla.1998). There, we held that defense counsel properly relied on a strategy of the "humanization" of the defendant rather than bringing to light evidence of his chronic alcoholism and anxiety disorder. Id. We particularly emphasized that this strategy was "dictated" by the defendant's insistence on his innocence, much like Sliney's insistence on his own innocence in this case. Id. As in Rutherford, we find that the selection of this strategy was not ineffective.
Even though counsel at Sliney's trial presented little evidence in mitigation, it appears that he presented nearly all available evidence. Postconviction counsel presented no witnesses that did not testify at the penalty phase, and we conclude that none of their additional testimony would have affected the outcome of the sentencing recommendation. The evidence presented below was neither qualitatively nor quantitatively better than the evidence actually presented at the penalty phase. See Hodges v. State, 885 So.2d 338, 346 (Fla. 2004) ("The mitigating evidence presented during the postconviction proceeding did exceed the quality and quantity of that presented at trial.").
Thus, we conclude that even if Cooper's[10] actions had been deficient in his *286 handling of investigating and presenting mitigation evidence, we find that these actions did not prejudice Sliney. Nothing was presented at the evidentiary hearing that undermines our confidence in the outcome of Sliney's sentencing proceeding. Sliney has simply failed to carry his burden on this issue because he put forth no other mitigation evidence that penalty-phase counsel was unaware of or should have presented that could have reasonably resulted in a different verdict.

IV. ANALYSIS OF HABEAS CLAIMS
Sliney's habeas petition asserts that his counsel on direct appeal was ineffective for failing to raise the following errors: (A) the State's repeated introduction of collateral crime evidence at trial; (B) the State's introduction of irrelevant and prejudicial hearsay testimony at trial; and (C) the prosecutor's fundamental misstatements of law and fact to the jury. Appellate counsel is deemed ineffective when (1) "alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance"; and (2) "the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). Appellate counsel cannot be deemed ineffective for failing to raise a claim which "would in all probability" have been without merit or would have been procedurally barred on direct appeal. Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000) (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)).
Sliney admits that the bases for each of his habeas claims were alleged errors that were not objected to at trial and thus could not have been raised at Sliney's direct appeal because they were procedurally barred. Therefore, in order to obtain relief, Sliney must show that the errors were fundamental error. Fundamental error "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Walls v. State, 926 So.2d 1156, 1176 (Fla.2006) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)).

A. Collateral Crime Evidence
Sliney argues that appellate counsel was ineffective because counsel failed to challenge the State's introduction of collateral crime evidence. Sliney asserts that evidence that he sold guns stolen from the pawn shop was evidence of a collateral crime (i.e., dealing in stolen property) that should not have been admitted.
Evidence is generally admissible, provided that it is relevant. Relevant evidence is defined as "evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (1993). However, "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (1993). Sliney argues that the evidence that he sold guns is unduly prejudicial and does not fall under any of the Williams[11] rule exceptions. In analyzing similar claims, we have noted:

*287 In the past, there has been some confusion over exactly what evidence falls within the Williams rule. The heading of section 90.404(2) is "OTHER CRIMES, WRONGS, OR ACTS." Thus, practitioners have attempted to characterize all prior crimes or bad acts of an accused as Williams rule evidence. This characterization is erroneous. The Williams rule, on its face, is limited to "[s]imilar fact evidence." § 90.404(2)(a), Fla. Stat. (1991) (emphasis added).
Thus, evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue. . . . It is necessary to admit the evidence to adequately describe the deed." Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.); see Gorham v. State, 454 So.2d 556, 558 (Fla.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 941, 83 L.Ed.2d 953 (1985); Erickson v. State, 565 So.2d 328, 332-33 (Fla. 4th DCA 1990), review denied, 576 So.2d 286 (Fla.1991); Tumulty v. State, 489 So.2d 150, 153 (Fla. 4th DCA), review denied, 496 So.2d 144 (Fla.1986).
Griffin v. State, 639 So.2d 966, 968 (Fla. 1994).
We deny Sliney's petition on this claim because his sale of the stolen guns was inextricably intertwined with the crimes charged. On two separate occasions, Sliney sold guns that were present in the pawn shop on the day prior to the armed robbery and homicide. The guns linked Sliney to the scene of the murder, and the discovery of his possession of the guns explains how Sliney became a suspect in the murder. Most importantly, Sliney was charged with armed robbery of the pawn shop. Evidence that he had possession of property that he was charged with stealing is clearly relevant and admissible. See id. at 969 ("Griffin concedes that his possession of the automobile was admissible because grand theft was a charge the jury was considering."). Thus, no error occurred in admitting this evidence at trial. Appellate counsel is not ineffective for failing to raise a meritless claim on direct appeal.

B. Hearsay Testimony
Sliney contends that appellate counsel was ineffective for failing to challenge the admission of irrelevant and prejudicial accusatory hearsay testimony. Sliney challenges the admission of the testimony of four State witnesses because he claims the statements were improper hearsay and unduly prejudicial. These statements were given by various parties who described their arrival at the scene of the crime. Deputy Joseph Marinola testified that "the call was dispatched as an aggravated battery. Subject was struck in the head with a hammer." The next witness, Gil Stover, a crime scene technician with the Charlotte County Sheriff's Office, was also asked why he was dispatched to the scene. He answered, "I was called by Detective Sergeant Twardzik in reference to a homicide that had been committed there." In addition, John Miller, a paramedic who arrived simultaneously with Deputy Marinola testified:

*288 I stepped out of the ambulance. The wife was coming out of the shop at that time. Immediately I knew something was wrong more so than we had received a call as a[n] individual had been hit by a hammer. I expected somebody who was working had possibly hit their hand or something. I wasn't expecting what we found, but knew instantly when we pulled up and saw the wife that something was worse.
Finally, Detective Cary Twardzik, the lead investigator in this case, testified: "On the evening of the 18th, I received a phone call at my house about six o'clock stating that there had been a robbery and a homicide."
We deny Sliney's petition on this claim because the above statements, even if they were hearsay, were not prejudicial to Sliney's case, and it was clearly not fundamental error for these statements to be admitted. These statements were not admitted to prove that a homicide occurred or that a hammer was used in the course of that homicide. Rather, these comments were merely statements to establish the logical sequence of events and constituted introductory statements to explain why the respective witnesses arrived at the crime scene. The facts to which the witnesses testified were not contested. There was competent and substantial other evidence that there was a homicide and a robbery and that the victim was struck with a hammer. The only issue in contention was whether Sliney was the perpetrator of the homicide and robbery. The challenged statements include no remarks indicating that Sliney was a suspect or some other particular detail of the crime that was not otherwise in evidence. See Harris v. State, 544 So.2d 322, 324 (Fla. 4th DCA 1989) ("There is a fine line that must be drawn between a statement merely justifying or explaining [police] presence or activity and one that includes incriminating (and usually unessential) details.").

C. Prosecutorial Misstatements
Sliney argues that appellate counsel was ineffective for failing to raise the issue of prosecutorial misconduct during the closing statement. At trial, Sliney testified that he and the victim got into an altercation, which resulted in both parties falling to the floor. When Sliney realized that the victim was unconscious and bleeding, he left the pawn shop, and thus he claims that he was not responsible for several other fatal wounds that the victim received. Based on this testimony, defense counsel argued that Sliney should not be found guilty of murder but that the jury could conclude that he was guilty of some other lesser included offense:
I don't know how you want to interpret the facts and I'm not going to ask you to interpret the facts in any way but to determine whether or not Jack Rilea Sliney is guilty rather of aggravated battery, but of something a little more serious, culpable negligence.
Whether his conduct of leaving [the victim] there to the mercy of [an accomplice] is felt inexcusable that, in fact it operates as culpable negligence.
Sliney contends that from the context of his trial counsel's argument, it is clear that counsel was inviting the jury to consider the offense of manslaughter by culpable negligence, a felony. However, in response to this comment, the prosecutor noted in closing:
While we're talking about the elements I think I need to clear up something rather quickly, and I'm sure that counsel didn't mean to mislead you. Culpable negligence is not a more serious crime than aggravated battery; aggravated battery being a felony and culpable negligence being a misdemeanor. I wanted to clear that up but I'm sure *289 that he did not mean to mislead anybody on that.
Sliney contends that the prosecutor's incorrect clarification of the law, coupled with the failure of the trial court to inform the jury of the degree or severity of all lesser-included offenses in relation to each other, effectively derogated defense counsel's credibility and veracity with the jury. Sliney argues that as a result, the jury was left to believe that defense counsel was trying to mislead them into convicting Sliney of a misdemeanor instead of a felony when, in fact, manslaughter by culpable negligence is a second-degree felony.
Sliney's argument that there was fundamental error based upon prosecutorial misconduct in the closing statement is without merit. Although the prosecutor made a mistake as to what defense counsel meant in his closing argument, the prosecutor repeatedly stated that defense counsel was not attempting to mislead the jury. Thus, we do not conclude that the prosecutor was intending to impugn the jury's view of defense counsel's credibility. We do not find there to be a basis upon which to grant habeas relief.

V. CONCLUSION
Since Sliney fails to raise an issue with any merit, we affirm the circuit court's order denying Sliney's rule 3.850 motion, and we deny Sliney's petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The aggravating factors were that (1) the murder was committed while Sliney was engaged in or was an accomplice in the commission of a robbery; and (2) the murder was committed for the purpose of avoiding or preventing lawful arrest.
[3] The statutory mitigating factors were that (1) Sliney had no significant prior criminal history; and (2) he was a youthful age at the time the crime was committed.
[4] The nonstatutory mitigating factors were that the defendant (1) was a good prisoner (accorded some weight); (2) was polite and mild-mannered (accorded little weight); (3) was a good neighbor (accorded little weight); (4) was a caring person (accorded little weight); (5) had a good school record (accorded little weight); and (6) was gainfully employed (accorded little weight).
[5] On direct appeal, Sliney asserted that (1) his confession was involuntary and should have been suppressed; (2) the trial court erred in admitting into evidence portions of the transcript of Marilyn Blumberg's 911 call; (3) the trial court erred in allowing the jury to hear taped conversations between Capeles and Sliney that included expletives and racial epithets; (4) the firearms register from the Blumbergs' pawn shop constituted inadmissible hearsay; (5) the trial court erred in excluding testimony from several inmates to whom Witteman admitted killing Blumberg; (6) the trial court erred in refusing to appoint an investigator to research mitigating evidence and in failing to allow the public defender adequate time to prepare for the penalty proceeding; (7) the trial court erroneously found both aggravating factors; (8) death is disproportionate; (9) the trial court erred in giving an upward departure sentence for the armed robbery count; and (10) the trial court improperly assessed fees and costs against Sliney.
[6] The claims raised by Sliney were that (1) trial counsel was ineffective for failing to investigate, develop, and present a defense of voluntary intoxication; (2) trial counsel was ineffective for failing to investigate, develop, and present evidence of compelling statutory and nonstatutory mitigating factors; (3) the trial court unconstitutionally shifted the burden of proof in its instructions to the jury at sentencing; (4) trial counsel was ineffective for failing to properly examine the jury during voir dire; (5) trial counsel was ineffective for failing to move for a change of venue; and (6) the defendant was denied a fair trial due to the cumulative effect of the errors made in his trial.
[7] Sliney fired Shirley on the day of the jury's guilty verdict. The trial court appointed Mark Cooper, a public defender, to represent Sliney at the penalty phase.
[8] Cooper also served as Sliney's original guilt-phase attorney, until Sliney's father hired Shirley (before the trial started).
[9] At a previous, unrelated supplementary postconviction hearing held on May 9, 2003, postconviction counsel did ask Shirley whether he previously represented Detective Sisk. Shirley responded that he had but that his prior representation did not influence his decision not to depose Detective Sisk. No other questions were asked regarding Shirley's representation of Detective Sisk.
[10] We recognize that Sliney brought this claim alleging ineffectiveness on the part of both his guilt-phase and penalty-phase counsel, Shirley and Cooper. However, Sliney fired Shirley on the day of his guilty verdict, and thus Cooper handled all of the penalty-phase proceedings. Therefore, we do not consider whether Shirley was ineffective at the penalty phase because he did not represent Sliney at that point. Moreover, we conclude that any deficiencies on Shirley's part in failing to prepare for the penalty phase did not prejudice the outcome of the sentencing phase.
[11] In Williams v. State, 110 So.2d 654, 662 (Fla.1959), we held that similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity. This rule is set out in section 90.404(2)(a), Florida Statutes (2006).