991 So.2d 962 (2008)
Bridgette JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 4D06-2783.
District Court of Appeal of Florida, Fourth District.
September 17, 2008.
Rehearing Denied October 22, 2008.
*963 Carey Haughwout, Public Defender, and David John McPherrin, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Daniel P. Hyndman, Assistant Attorney General, West Palm Beach, for appellee.
MAY, J.
The defendant appeals from her conviction for exploitation of the elderly, arguing that the trial court erred in denying her motion for judgment of acquittal and in admitting evidence concerning the alleged victim's Will. Because the evidence of the Will was irrelevant and not harmless, we reverse and remand the case for a new trial.
In 2002, the defendant became the fulltime caretaker for the alleged victim, who suffered from dementia/Alzheimers. In March 2003 the defendant accompanied the alleged victim to an attorney's office, where the alleged victim consulted with the attorney concerning her Will. The defendant remained in the waiting room during the consultation. The attorney subsequently prepared the Will, which left the alleged victim's condominium and one-half of her estate to the defendant. No one testified that the defendant had any involvement in the drafting of the Will or that she knew that she was a beneficiary under the Will.
In April, 2003 the alleged victim and her friend, accompanied by the defendant, went to the bank, closed a $61,052.18 matured certificate of deposit [CD], and, at the suggestion of the friend, had the proceeds issued in the form of a cashier's check made payable to the defendant. The defendant stood in the bank lobby, approximately six to ten feet away, during the transaction.
In July, 2003 the alleged victim's physician placed a call to the Department of Children and Families (DCF) when he became concerned about the alleged victim's competency. The DCF investigation led to the State charging the defendant with exploitation of the elderly, arising from the CD transaction. The Information alleged that the defendant
did stand in a position of trust and confidence, or have a business relationship, with an elderly person or a disabled adult, . . . and knowingly, by deception or intimidation, obtained or used, or endeavored to obtain or use, the funds, assets, or property of [the victim]; or [the defendant] knew or should have known [the victim] lacked the capacity to *964 consent, and obtained or endeavored to obtain or use, or assisted another in obtaining or using or endeavoring to obtain or use, the funds, assets or property of [the victim], to wit: U.S. Currency, of the value of twenty thousand dollars ($20,000.00) or more but less than one hundred thousand dollars ($100,000.00), with the intent to temporarily or permanently deprive [the victim], of the use, benefit, or possession of her property, for the to [sic] benefit of someone other than [the victim], contrary to F.S. 825.103(1) and F.S. 825.103(2)(B)(L7).
Prior to trial, the defendant moved to exclude any evidence concerning the alleged victim's Will. Defense counsel argued that the Will had no relevance to the exploitation charge because the Information was limited to the subsequent CD transaction. Defense counsel also argued that the Will constituted inadmissible Williams[1] rule evidence.
The State responded that the Will was relevant to prove the defendant stood in a "position of trust and confidence" with the alleged victim, an element of the charged offense. The trial court denied the motion, finding that the Will was relevant and inextricably intertwined with the charged offense. The jury was unable to reach a verdict in the first trial; the court declared a mistrial.
Before the second trial, the defense renewed its motion in limine. This time, the State argued that the Will proved exploitation pursuant to the allegations of the Information. However, defense counsel reminded the court that the Information was limited solely to the CD transaction; there were no allegations involving the Will. The trial court again denied the motion. The alleged victim died before the second trial.
At trial, the alleged victim's physician testified that she suffered from a memory deficit and Alzheimers as early as 2001. According to the physician, he informed the defendant of the alleged victim's advanced dementia the first time she accompanied her to his office. The defendant denied having had this conversation.
The defendant testified that she did not see any signs of dementia when she first started working for the alleged victim during the summer of 2002. She explained that initially the alleged victim could take care of herself, paying her own bills and going shopping, but she sometimes needed help with her checkbook. She admitted that she was in a position of trust and confidence with the alleged victim.
The attorney who prepared the Will testified that he met with the alleged victim twice before preparing the Will. The defendant was not present during those discussions. He would not have prepared the Will if he didn't think the alleged victim knew what she was doing. The defendant confirmed that she brought the alleged victim to the attorney's office, but denied any knowledge of what took place.
The assistant bank manager testified that she helped the alleged victim with the CD transaction. The alleged victim seemed confused, but her friend told her to make the cashier's check payable to the defendant. While the assistant manager thought it suspicious, she testified that the alleged victim was very talkative and appeared to know what she was doing. The defendant waited in the lobby area of the bank during the transaction. However, at some point during the visit, she briefly moved from the lobby to the bank manager's desk. The bank manager testified that she overheard the alleged victim ask the defendant if she was mad at her.
*965 According to the defendant, the alleged victim gave the defendant the check as a gift. She told the defendant that it was because she had been there for her and she wanted her to buy a house. The defendant deposited the check fifteen days later and bought a house with the money.
On July 21, 2003 the defendant took the alleged victim to the doctor after she suffered a broken wrist in a fall in her apartment. The defendant advised the doctor that the alleged victim needed someone to take care of her after the fall. The alleged victim had complained to the defendant that no one was there for her after her previous aide died and she didn't get along with her sister-in-law, who lived in the same complex. It was at this point that the doctor referred the matter to DCF. The doctor never saw the alleged victim again.
The DCF investigator testified that he went to the defendant's home, with a law enforcement officer, where they met the defendant and the alleged victim. The alleged victim was unsure of her whereabouts and they were unable to determine if she had consented to being there. The defendant told the investigators that the alleged victim had Alzheimer's and explained that she had brought the alleged victim to her home for safety after the fall. Subsequently, when the DCF investigator facilitated an evaluation of the alleged victim, the defendant did not allow the social worker access until the social worker summoned the DCF investigator, who arrived with police officers.
On August 1, 2003, the defendant filed a Petition to Determine Incapacity, alleging that the defendant had been taking care of the alleged victim and had observed her condition to be deteriorating. The Petition asserted that the alleged victim had been diagnosed with dementia and that the defendant's sister had personal knowledge of the alleged victim's condition. The petition sought the creation of a guardianship.
That Petition was later withdrawn because the alleged victim's sister-in-law also filed a petition. That petition resulted in the alleged victim's niece being appointed the Guardian. Both women testified that the alleged victim was incompetent at the time of the CD transaction.
No one disputed the alleged victim's incapacity by August 2003. The trial focused on when the alleged victim became incapacitated, when the defendant became aware of that fact, and whether the defendant had exploited either a position of trust and confidence or a business relationship with the alleged victim in taking the money from the CD.
Throughout the trial the State wove the Will evidence into the exploitation charge. The State told the jury: "Rather than show you just the tree and make you examine and go around and look at the tree, I have tried to give you the forest so you can . . . make a decision. . . . I have given you the . . . lawyer that drafted a will, so you could evaluate that testimony as well." The State acknowledged that the exploitation charge involved only the CD transaction. "That's the question here. Whether [the Victim] had the capacity to consent on April the 1st of 2003 and understood what she was doing when she signed her name to that check." However, in urging the jurors to look at the evidence, the State directed their attention to the Will. The State argued that the defendant "saw an opportunity to get what she thought she was entitled to, because no one else was helping her care for [the defendant]. . . . She thought she was entitled to 61,000 dollars, and, while at it, throw in half of the estate and the condo as well."
*966 Having lost the motion in limine, defense counsel argued in closing that the evidence concerning the Will actually supported the defense because the attorney testified to the alleged victim's capacity to execute the document just prior to the CD transaction. He reminded the jury that the defendant was not on trial for the Will.
The jury found the defendant guilty of exploitation of an elderly person or disabled adult. On appeal, the defendant questions the sufficiency of the evidence and the admissibility of evidence concerning the Will. We find the evidence sufficient to withstand the defendant's motion for judgment of acquittal, but find that the trial court erred in admitting evidence concerning the Will.
A trial court's decision to admit Williams rule evidence is reviewed for abuse of discretion. Chandler v. State, 702 So.2d 186, 195 (Fla.1997); Donohue v. State, 979 So.2d 1058, 1059 (Fla. 4th DCA 2008). However, the discretion afforded trial courts in evidentiary matters is limited by the rules of evidence. Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001) (citing Taylor v. State, 601 So.2d 1304, 1305 (Fla. 4th DCA 1992)).
Here, defense counsel moved in limine to exclude evidence concerning the Will on two bases. First, defense counsel argued that it was irrelevant, because it did not tend to prove or disprove a material fact. § 90.401, Fla. Stat. (2007). In response, the State argued that the Will was relevant to prove the defendant occupied a position of trust and confidence with the alleged victim, an element of the crime. The trial court agreed with the State and found the Will's probative value outweighed any prejudice.
Second, defense counsel argued that the Will constituted inadmissible Williams rule evidence. However, the trial court found that the Will was inextricably intertwined with the CD transaction and was not being introduced as evidence of other crimes. We disagree.
The Evidence Code defines relevant evidence and codifies one of its subparts, the Williams rule. Relevant evidence is that which tends "to prove or disprove a material fact." § 90.401, Fla. Stat (2007). While "[s]imilar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue," it is "inadmissible when the evidence is relevant solely to prove bad character or propensity." See § 90.404(2)(a), Fla. Stat. (2007). This rule serves to "minimize the risk of a wrongful conviction." McLean v. State, 934 So.2d 1248, 1255 (Fla.2006). Here that risk was not avoided.
In determining relevance, we look to the elements of the crime charged and whether the evidence tends to prove or disprove a material fact. The exploitation statute provides for two theories of prosecution. See § 825.103(1)(a)1 & 2, Fla. Stat. (2007).[2] At trial and on appeal, the State continues to argue that the Will tends to prove that the defendant occupied a position of confidence and trust with the victim. We disagree.
Being named a beneficiary of a Will proves nothing more than that the testator chose to leave assets to that person, regardless of the nature of any relationship. *967 And it was unnecessary for the State to admit the Will to prove that the defendant occupied a position of trust and confidence because the defendant readily admitted that fact.
The Will, viewed in isolation, was not a bad act. However, the spin placed on it by the State suggested that the defendant possessed bad character or propensity to exploit; she was a greedy person who, unsatisfied with being a beneficiary in the Will, considered herself entitled to additional cash.[3] This turned the otherwise irrelevant and generic fact of being the beneficiary in a Will into the very "bad act" evidence deemed inadmissible under section 90.404, Florida Statutes (2007). It became a prejudicial sword wielded by the State to convict the defendant.
As a bad act and subject to the requirements of section 90.404, the State was required to prove "that the defendant committed the collateral acts by clear and convincing evidence." See McLean v. State, 934 So.2d 1248, 1256 (Fla.2006). The State failed to prove this prerequisite for admissibility of a bad act. Under the circumstances, it was an abuse of discretion for the trial court to admit this evidence.
We might have found this error harmless, but for the State's relentless reliance on the Will. In its opening, the State told the jury that it would prove the defendant's exploitation of the alleged victim involved not only taking the money from the CD, but also becoming a future recipient of her condominium and half of her estate as a beneficiary of the Will. In closing, the State argued that the defendant "saw an opportunity to get what she thought she was entitled to, because no one else was helping her care for [the victim]. . . . She thought she was entitled to 61,000 dollars, and, while at it, throw in half of the estate and the condo as well."
When this kind of irrelevant evidence is admitted, . . . there is a presumption that the error was harmful, because of "the danger that the jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged."
Williams v. State, 692 So.2d 1014, 1015 (Fla. 4th DCA 1997) (quoting Straight v. State, 397 So.2d 903, 908 (Fla.1981)).
For these reasons, we reverse and remand the case for a new trial, excluding the evidence of the Will.
Reversed and Remanded.
STEVENSON, J., and LABARGA, JORGE, Associate Judge, concur.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.1959).
[2] Any person "who knows or reasonably should know that the elderly person or disabled adult lacks the capacity to consent," is criminally liable for obtaining or using the victim's property with the intent to temporarily or permanently deprive the victim of its use, benefit, or possession. § 825.103(1)(b). Alternatively, an individual who either stands in a position of trust and confidence with the victim or has a business relationship with the victim is guilty of exploitation when she "[k]nowingly, by deception or intimidation" obtains or uses the victim's property. § 825.103(1)(a).
[3] We also disagree with the trial court's finding that the Will and the CD transaction were inextricably intertwined. It would be relatively easy to separate the Will from the knowing receipt, deposit, and expenditure of the proceeds from the CD transaction. Sliney v. State, 944 So.2d 270, 287 (Fla.2006) (To be "admissible under section 90.402" as non-Williams rule evidence, the other act must be "a relevant and inseparable part of the act which is in issue.") (emphasis added). Neither is the Will "necessary to . . . adequately describe" the CD transaction. Id.